[Cite as *State v. Croom*, 2013-Ohio-5682.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE NO.    12 MA 54 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| VS. | ) | O P I N I O N |
| | ) | |
| STANLEY CROOM, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |


CHARACTER OF PROCEEDINGS:           Criminal Appeal from Common Pleas
                                                          Court, Case No. 10CR35.


JUDGMENT:                                          Affirmed in part; Reversed in part;
                                                          Remanded.


APPEARANCES:
For Plaintiff-Appellee:                          Attorney Paul Gains
                                                          Prosecuting Attorney
                                                          Attorney Ralph Rivera
                                                          Assistant Prosecuting Attorney
                                                          21 West Boardman Street, 6th Floor
                                                          Youngstown, Ohio  44503


For Defendant-Appellant:                     Attorney Douglas King
                                                          91 West Taggart Street
                                                          P.O. Box 85
                                                          East Palestine, Ohio  44413


JUDGES:
Hon. Joseph J. Vukovich
Hon. Gene Donofrio
Hon. Mary DeGenaro


                                                          Dated:  December 13, 2013

VUKOVICH, J.

{¶1} Defendant-appellant Stanley Croom appeals after being convicted in the Mahoning County Common Pleas Court of aggravated robbery with a firearm specification, having a weapon while under disability, and attempted aggravated murder with a repeat violent offender specification. Appellate counsel raises issues with the sufficiency of the evidence, the weight of the evidence, and the victim's identification from a photographic array. These arguments are overruled.

{¶2} Counsel also argues that the repeat violent offender specification and the weapon under disability conviction should be reversed because there was no jury waiver signed by the defendant, made in open court, and filed in the case. The laws dealing with waiver of a jury trial are inapplicable to the repeat violent offender specification. However, they are applicable to the weapon under disability charge. The Supreme Court requires strict compliance with the statutory test for waiving a jury trial. Since there was not strict compliance here, the weapon under disability conviction is reversed and remanded. Judgment as to the other offenses is affirmed.

STATEMENT OF THE CASE

{¶3} Around 7:20 p.m. on December 29, 2009, a man entered Belleria Pizza in Youngstown with a gun and demanded money from the register. The cashier hit a panic button, which alerted the Youngstown police. When she could not open the register, the robber left the store. She reported to Youngstown police that the robber was a black male around 50 years old wearing a black coat with brown fur around the hood. It was also reported that he was approximately 6 feet tall and 200 pounds.

{¶4} The first responding officer watched the store's surveillance video and noticed that the robber had on a black wave cap and that he raised the fur-trimmed hood on his dark jacket as he neared the register. In addition, the officer noticed that the robber wore dark gloves with yellow writing on them.

{¶5} A bystander outside of the restaurant reported the robbery to a police officer at Youngstown State University, stating that the robber was a dark-complected black man wearing a thick, black coat with fur and that another black male wearing a

black hat was the get-away driver of an older model dark pink or maroon Lincoln with damage to the rear. (Tr. 687).

{¶6} A police officer listening to the bulletin realized that she was familiar with the vehicle described therein. She testified to its distinctive "weird" color and the rear-end damage. She knew where the owner of the car lived because she worked security at his apartment building. (Tr. 666). She did not find the car there, but she did see it while patrolling the streets less than an hour after the robbery, and she thus effected a stop of the vehicle. (Tr. 667).

{¶7} Defendant-appellant Stanley Croom, the car's owner whom she recognized, was driving. (Tr. 670). Jeffrey Shorter, appellant's co-defendant in the robbery case, was the passenger. (Tr. 673). A black hat and black gloves with yellow writing were found in the vehicle. (Tr. 651). There was a large amount of DNA on both items that belonged to Shorter, and the gloves also had some DNA consistent with appellant's DNA (but also consistent with one out of fifty people).

{¶8} Two days after the robbery, a detective showed two six-person photographic arrays to the victim. The victim picked the photograph of appellant from the second array. She did not identify anyone from the first array, which contained Shorter's photograph.

{¶9} In January 2010, appellant was indicted for aggravated robbery with a gun specification and having a weapon while under a disability. He filed a motion to suppress the photographic identification. A hearing was held, and the court denied the motion.

{¶10} In January 2012, a superseding indictment was filed adding charges of attempted aggravated murder with a repeat violent offender specification and retaliation. These charges were based upon the report of a fellow jail inmate, who stated that appellant asked him to eliminate the victim.

{¶11} Appellant and Shorter were tried together. Shorter was represented by counsel, and appellant represented himself. Pursuant to an agreement between the state and the defense, appellant's weapon under disability charge and his repeat

violent offender specification were tried to the court while the other charges were tried to a jury. Appellant was found guilty of all charges.

{¶12} On March 1, 2012, the court sentenced appellant to eleven years for attempted aggravated murder, three years for the repeat violent offender specification, ten years for aggravated robbery, three years for the firearm specification, and three years for having a weapon under disability, for an aggregate sentence of thirty years. The retaliation count was merged into the attempted aggravated murder count. Appellant filed a timely notice of appeal.

### ASSIGNMENT OF ERROR NUMBER ONE

{¶13} Appellant's first assignment of error contends:

{¶14} "A NUMBER OF THE DEFENDANT/APPELLANT'S CONVICTIONS HEREIN ARE BASED ON LEGALLY INSUFFICIENT EVIDENCE."

{¶15} Sufficiency of the evidence is a test of adequacy (as opposed to credibility or weight of the evidence). *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id.* In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements proven beyond a reasonable doubt. *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). Appellant raises separate sufficiency arguments regarding each of the three offenses and the two specifications. We thus separately evaluate the elements of each offense and each specification

### Attempted Aggravated Murder

{¶16} Appellant was convicted of attempted aggravated murder under R.C. 2903.01(A) and R.C. 2923.02(A). This type of aggravated murder involves purposely causing the death of another with prior calculation and design. R.C. 2903.01(A). The attempt alleged in this case is characterized by purposeful conduct that, if successful, would constitute or result in the offense. R.C. 2923.02(A) (purposeful is the applicable mental state because that mental state is required for the underlying offense of aggravated murder).

{¶17} An attempt occurs when one purposely does or omits to do something that constitutes a substantial step in a course of conduct designed to culminate in the commission of the offense. *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 95, citing *State v. Woods*, 48 Ohio St.2d 127, 357 N.E.2d 1059 (1976). The substantial step must be strongly corroborative of the criminal purpose, e.g. it demands police intervention in order to prevent the crime at the time the criminal intent becomes apparent. *Id.*

{¶18} Appellant argues that words are not acts and that his alleged words, although they could be used to show the intent part of the attempt test, cannot be used to show the substantial step part of the test. He urges that the substantial step part of the attempt test requires an overt act and implies that it must be in the form of physical movements. He notes that the inmate had no intent to carry out the murder and that appellant could not take a substantial step toward the alleged plan himself because he remained in jail.

{¶19} In the *Group* case, the defendant shot two people, one of whom survived and identified him. While awaiting trial in jail, the defendant asked a fellow inmate, who was soon to be released, to fire-bomb the survivor's house. The defendant told the other inmate that the victim no longer lived in the house and the bombing was to scare her and to lead the police on another trail. The defendant offered $150,000 in cash that he had hidden away and offered to help the other inmate dissuade a witness from testifying in his case. He instructed the other inmate how to make the bomb, how to light it, and where to throw it. He also told him to leave a keychain with a certain name on it at the scene. Thereafter, the defendant wrote letters to the other inmate in which he referred to something he needed done and provided the victim's address. The released inmate went to the victim's house, and when he realized the victim was living in the house, he went to the prosecutor with the defendant's letters.

{¶20} The Supreme Court noted that two Ohio courts and many state courts around the country have taken the view that merely soliciting another to commit a crime does not constitute attempt. *Id.* at ¶ 96. The Court initially stated that Group

did more than merely solicit the firebombing because "[h]e took all action within his power, considering his incarceration, to ensure that the crime would be committed." *Id.* at ¶ 97. Then, the Court went on to adopt a position that solicitation could constitute the necessary step depending upon the circumstances of the case.

**{¶21}** In doing so, the *Group* Court reviewed a case where a defendant instructed a fellow inmate, who was expected to be released soon, that he should kill someone outside the jail (telling the other inmate identifying details about the intended victim, how he should do it, and how he would be paid). *Id.* at ¶ 98, citing *State v. Urcinoli*, 321 N.J.Super. 519, 729 A.2d 507 (1999). The Court then reviewed a case where the defendant and the potential killer reached a price for a hit. The defendant told the person to get close to the victim first to gain her trust. After the potential killer visited the victim, he abandoned the scheme and reported it to the police. *Id.* at ¶ 99, citing *Braham v. State*, 571 P.2d 631 (Alaska 1977). The Ohio Supreme Court noted that these scenarios were both found to be sufficient for an attempt conviction. *Id.*

**{¶22}** The Court then set forth the position of the federal courts, which includes a holding that the determination of whether particular conduct constitutes an attempt is so dependent on the particular facts of each case that there cannot be a "litmus test" to guide the reviewing courts. *Id.* at ¶ 100. The *Group* Court then quoted the Second and Fifth Circuit's conclusion: "Following this analysis, which we consider the better reasoned approach, several federal courts have concluded that a solicitation accompanied by the requisite intent may constitute an attempt." *Id.*, quoting *United States v. American Airlines, Inc.*, 743 F.2d 1114, 1121 (5th Cir.1984), quoting *United States v. Ivic*, 700 F.2d 51, 66 (2d Cir.1983).

**{¶23}** The Supreme Court of Ohio then agreed with these federal courts and held that a rigid approach to the attempt offense should be avoided. *Id.* at ¶ 101. The Court concluded that its own prior *Woods* test falls under this non-formalistic approach: a substantial step in the course of conduct planned to culminate in the crime, and the substantial step must be strongly corroborative of the criminal purpose. *Id.* at ¶ 101-102. The Court explained that the "overt act" referred to in

*Woods* is merely an act that meets the substantial step test. *Id.* at ¶ 102. The Court pointed out that "attempt" is broadly defined in the statute as merely conduct that if successful would constitute or result in the offense. *Id.* at ¶ 101.

**{¶24}** We thus review the particular facts of this case under the broad and flexible test enunciated in *Group* with no requirement of a specific overt physical act that must occur outside of the jailhouse and with the inclusion of words as part of the substantial step evaluation. *See id. See also Woods*, 48 Ohio St.2d at 132 (pointing out that whether there was a substantial step depends on the offense at issue and all of the particular facts of the case at hand).

**{¶25}** Here, a twenty-one year old inmate was incarcerated in the county jail from August of 2011 until January 10, 2012 for breaking and entering. (Tr. 693). He disclosed that appellant knew he would be bonding out soon upon the resolution of other charges and the resulting decrease in his bond. (Tr. 704). He testified that appellant instructed him to remove a witness and told him, "No witness. No case." (Tr. 700). The inmate said that appellant told him the witness's first and last name, what she looked like, the name of the place she worked, the location of that place of employment, the best times to find her at work, when and where to kill her, and how he wanted it done. (Tr. 700-701). According to this inmate, appellant said to fill a syringe with Drano and stick it in the witness's neck. (Tr. 701).

**{¶26}** The inmate testified that appellant claimed to have six pounds of marijuana at his grandparents' house, and after the witness was eliminated and appellant was released, he would pay for the hit with two pounds of marijuana and the money obtained upon the sale of a third pound. (Tr. 702, 730). The inmate was to contact appellant's sister to have her: "Tell Stan it's good or it's bad." (Tr. 723).

**{¶27}** He also identified two pieces of paper. One contained the witness's name (spelled correctly despite its unusual spelling), which he stated that he wrote down in appellant's presence; he noted that appellant corrected him on the spelling of the name and that the correction can be seen on the paper. (Tr. 704-705). The other note contained the name and number of appellant's sister, which the inmate said was written by appellant, noting that the appellant's handwriting much neater

than his on the other paper.  He testified appellant gave him this note on December 28, 2011, just before the inmate left for his scheduled municipal court hearing, as it was anticipated he would bond out after the hearing as his remaining bond would only be $250.  (Tr. 706, 726).

**{¶28}** After the hearing, the inmate asked to speak with a detective he knew whose office was at the municipal courthouse, and he told the detective appellant's plan and gave him the notes.  (Tr. 703, 707).  The inmate testified that he was afraid to "get in the mix" because he does not want appellant "on my back when he gets out" but that he could not allow something to happen to the witness.  (Tr. 696, 708).

**{¶29}** The fellow inmate's testimony is not evaluated for credibility here.  Rather, his testimony is reviewed in the light most favorable to the state.   Merely because the inmate had no intent to carry out the plan does not relieve appellant from liability.  The hired inmate in *Group* never planned to kill the woman either as the defendant told him the house was vacant.  The Supreme Court imposed no meeting of the minds requirement.  *See Group*, 98 Ohio St.3d 248 at ¶ 92.  Furthermore, there was no additional conduct engaged in by the defendant in the *Urcinoli* case utilized by the Ohio Supreme Court in *Group* as an example of a substantial step.  *Id.* at ¶ 98, citing *Urcinoli,* 321 N.J.Super. 519 (other inmate to be released soon, discussed victim's identifying details, how plan would be carried out, and how other inmate would be paid).

**{¶30}** As in *Group*, appellant was incarcerated and looking at a long prison term if convicted, which conviction would turn on the testimony of the person sought to be killed.  Just like the *Group* case (and *Urcinoli* cited therein*)*, appellant knew his fellow inmate would be getting released soon.  Also similar to *Group*, appellant claimed to possess certain assets of which he promised to provide half as payment for the hit.

**{¶31}** Appellant provided a description, a name with a proper spelling, the name of her employer, the location of the place of employment (across from a local high school), approximate days and hours worked, the time to kill her (after work), the place to kill her (parking lot), and the method of killing her (a syringe filled with Drano

to the neck). Appellant also provided his sister's name and address in order for the inmate to report his success, and that note was introduced into evidence. Notably, this paper was provided on the day the other inmate was being transported to a municipal court for disposal of certain charges, which would allow his release.

**{¶32}** Finally, the inmate took the conversation seriously and was concerned for the safety of the woman to the extent that he reported the offense. There was no sustained contact by the defendant with the hired inmate after that inmate's release as in *Group*, but the inmate here reported the plan to police prior to his release.

**{¶33}** The conduct alleged here if successful would have resulted in aggravated murder. Considering the evidence in the light most favorable to the state, some rational juror could conclude that appellant did all he could while incarcerated to accomplish his goal of killing the witness to the aggravated robbery. Under the particular circumstances existing in this case, a substantial step toward the offense was undertaken by the combination of words, instructions, payment method, and the provision of the various details and contact number. In accordance, there was sufficient evidence of attempted aggravated murder, and this argument is overruled.

Repeat Violent Offender Specification

**{¶34}** Appellant complains that the state failed to provide evidence of his prior convictions to support the repeat violent offender specification before the state rested its case, alleging that it was not until the close of the defense's case that the state offered its Exhibit 19, a certified copy of a 1985 judgment entry showing prior convictions for Stanley Croom. Appellant points out that after the prosecution offered this exhibit, the court failed to specifically rule that it was admitted. Appellant also states that the prosecution did not meet its burden regarding "authenticity" and failed to prove that the prior conviction actually belonged to appellant. He relies on R.C. 2945.75(B)(1), which provides that when it is necessary to prove a prior conviction, a certified copy of the entry of judgment in that prior conviction together with evidence sufficient to identify the defendant named in the entry as the offender in the case at bar, is sufficient to prove such prior conviction.

**{¶35}** Initially, we point out that this statute specifically provides that a certified copy of the prior conviction (together with evidence matching the defendant in the conviction with the current defendant) is sufficient proof. R.C. 2945.75(B)(1). Thus, a clerk need not testify that the certified copy actually came from the court's journal. Furthermore, a certified copy of a public record is self-authenticating. Evid.R. 902(4). Thus, any suggestion that the certified copy of appellant's prior conviction had to be authenticated is without merit.

**{¶36}** Pursuant to R.C. 2941.129(B), the court shall determine the repeat violent offender specification. Appellant does not explain then why the state would have to submit its evidence of prior convictions for this specification during its case-in-chief in the jury trial of the underlying offense. Indeed, had the state done so, it would have been to the detriment of the defendant. Accordingly, appellant's argument is without merit.

**{¶37}** After presenting its witnesses, the assistant prosecutor specifically stated, "Pending exhibits, the state rests." The court reiterated that the state was resting subject to the introduction of exhibits. (Tr. 790). Defense counsel for the co-defendant then asked if he should make his motion for an acquittal at that point, and the court said he could. (Tr. 790-791). Counsel argued that there was no evidence to tie Shorter to the robbery. He set forth no argument on prior convictions. (Tr. 791). The court then prompted appellant to join in the motion and suggested he include the weapon under disability and the repeat violent offender specification in his acquittal motion. (Tr. 792).

**{¶38}** At that point, the prosecutor injected that before she responded to the acquittal motion, she wanted to determine if they ever made it clear on the record that they were severing those latter counts. She voiced that she did not want to overlook those offenses and admitted that she could not remember if they placed the agreement on the record. (Tr. 792).

**{¶39}** The trial court answered that they did make the severance clear on the record and noted that the court just wanted to include those charges in appellant's motion (presumably because if there was insufficient evidence of the offenses tried to

the jury, the offenses reserved for the court would not stand either).   (Tr. 792). (Apparently, although it was voiced to the court off the record, they did not in fact previously place their agreement to sever the repeat violent offender specification in the record at trial.)

**{¶40}** Thereafter, the prosecutor asked, "because we are not obviously doing weapon under disability and the violent specification to the jury, can I submit those items to you subsequent?" The court replied:  "Yeah.  What we put on the record and what we agreed to was, and I am hearing those two charges simultaneously with the jury, and there's an agreement and stipulation that the underlying charge, that there is a previous conviction, et cetera.  The prosecutor responded, "Correct."  (Tr. 794). The court continued, "So I'm going to wait to hear the rest of the case and go from there."  (Tr. 794-795).

**{¶41}** The court then formalized the co-defendant's assertion of his Fifth Amendment rights, and released the jury for the day.  At that point, the court stated that they would square away the state's exhibits.  (Tr. 802-803).  Thus, contrary to appellant's suggestion, the issue was addressed *prior* to the state's complete resting of its case as the state rested pending exhibits and the trial court then specifically instructed the prosecution to hold the prior conviction exhibit until the end of the entire case*.*

**{¶42}** Concerning the argument on sufficiency, as the state points out on appeal, after the entire case was presented, the prosecution stated:

**{¶43}** "Regarding the certified copies of convictions for Stanley Croom and Jeffery Shorter that we discussed yesterday, I couldn't put those in in the presence of the jury, so now I'm doing it outside the presence of the jury.

**{¶44}** "Parties have agreed that State's Exhibit 19, which is a judgment entry and sentence regarding Stanley Croom, showing his conviction of murder and aggravated robbery in 1983, that shall be used for purposes of his weapon under disability charge and prior crime of violence specification that the judge is making the decision on, not the jury.  *  *  * They are moved by the state into evidence and will not go to the jury, just for the judge"  (Tr. 905-906).

**{¶45}** The court made no response at that point, and the jury was called back into the courtroom. (Tr. 906). After the jury returned their verdicts, the prosecution noted that the court needed to address the two severed charges, and the court responded that it would do so in a judgment entry. (Tr. 1036).

**{¶46}** The court's mere failure to specifically state that the exhibit was "admitted" is not fatal. This was not an exhibit to be presented to the jury. The certified copy of a prior conviction for a repeat violent offender specification is very often presented at sentencing without a formal statement by the trial court that the item is "admitted."

**{¶47}** In any event, there was a stipulation in this case. *See State v. Runner*, 7th Dist. No. 99BA36 (May 16, 2011) ("After the prosecution had agreed to the stipulation, there was no reason to refer to any evidence other than the stipulation itself as proof of the prior crimes."). That is to say, the prosecutor was placing a stipulation regarding the use of the document into the record, while it proffered the judgment entry to the court. This agreement authenticated the convictions and established that they belonged to appellant. There is no need for a court to rule that a proffer of a stipulation is "admitted."

**{¶48}** Finally, neither the co-defendant's attorney nor defendant pro se voiced any objections to the prosecutor's characterization of the agreement or the offer of the exhibit. Nor did they previously object when the state referenced the agreement *or when the court specified*, "there's an agreement and stipulation that the underlying charge, that there is a previous conviction, et cetera." (Tr. 794). Considering all of these facts, appellant's argument here lacks merit.

<u>Firearm Specification</u>

**{¶49}** Appellant argues that the evidence in support of his firearm specification was legally insufficient. He notes that no gun was recovered and no shots were fired.

**{¶50}** A firearm means any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. R.C. 2923.11(B)(1). A firearm includes an unloaded firearm, and any firearm that is

inoperable but that can readily be rendered operable. *Id.* In determining whether a firearm is capable of expelling or propelling a projectile by the action of an explosive or combustible propellant, the trier of fact may rely upon circumstantial evidence, including, but not limited to, the representations and actions of the individual exercising control over the firearm. R.C. 2923.11(B)(2).

**{¶51}** The victim testified that appellant pointed a gun at her with one hand as he grabbed her arm with his other hand. (Tr. 536, 540). He kept "screaming" to give him the money. (Tr. 537). He demanded, "give me the money out of the register and nobody will get hurt." (Tr. 536). Thus, we not only have the threat involved in pointing the gun at someone while grabbing their arm and repeatedly and loudly demanding money out of the cash register, which are sufficient in themselves, but we also have explicit threats of injury. *See State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997) ("Even absent any explicit verbal threats on the part of Thompkins, the trier of fact in this case could have reasonably concluded, based on the totality of the circumstances, that Thompkins was in possession of a firearm at the time of the offense, that is, a deadly weapon capable of expelling projectiles by an explosive or combustible propellant.").

**{¶52}** Moreover, the victim described the gun as a black revolver with brown handgrips. (Tr. 538). She explained the difference between a revolver and a semi-automatic, which was knowledge she gained while serving in the military. (Tr. 538-539). In fact, she spent 12 years in the army during which time she was armed with at least two different types of firearms. (Tr. 530, 532, 539). Her testimony on the matter of the gun is thus stronger than in many other cases.

**{¶53}** Another employee, who exited the kitchen after hearing the robber yelling and demanding the money, also testified that the robber had a black revolver. Seeing this gun, caused her to drop to the floor and crawl back into the kitchen. (Tr. 517). Finally, a gun can be seen in the robber's hand in State's Exhibit 9, which was a photograph produced from the store's surveillance video.

**{¶54}** Viewing all of the direct and circumstantial evidence presented on the matter of the firearm in the light most favorable to the state, some rational juror could

find that the object in the robber's hand was a deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. *See* R.C. 2923.11(B)(1) (which includes an unloaded or inoperable gun that can be readily rendered operable). In accordance, this argument is without merit.

<u>Weapon Under Disability</u>

**{¶55}** Appellant was convicted of violating R.C. 2923.12(A)(2) for knowingly having, carrying, using, or possessing a firearm after being convicted of any felony offense of violence. Appellant contends that there was insufficient evidence to support the weapon under disability charge because there is no proof that the object the robber held fit the definition of a firearm. He reiterates the argument presented regarding the firearm specification addressed above. For the same reasons expressed above, this argument is without merit as the totality of the circumstances viewed in the light most favorable to the state allow a reasonable fact-finder to conclude beyond a reasonable doubt that the object held by the robber was a firearm.

**{¶56}** Appellant's other sufficiency argument regarding the weapon under disability offense is the same argument we disposed of above (regarding the repeat violent specification): that his prior convictions were not properly admitted as an exhibit due to timing and the lack of authentication or establishment that the person in the prior conviction is actually him. For the same reasons expressed above, this sufficiency argument also fails. (We note here that the weapon under disability conviction is reversed and remanded in assignment of error number four due to the lack of a proper jury waiver.)

<u>Retaliation</u>

**{¶57}** Appellant was convicted of retaliation in violation of R.C. 2921.05(B), which provides: "No person, purposely and by force or by unlawful threat of harm to any person or property, shall retaliate against the victim of a crime because the victim filed or prosecuted criminal charges." Appellant argues that the evidence concerning this offense was insufficient and the verdict was contrary to the manifest weight of the

evidence because he did not communicate a threat to the victim, citing an Eighth District case for the principle that the defendant must have intended or reasonably expected his threat to be communicated to the victim. *See State v. Oliver*, 8th Dist. No. 90880, 2009-Ohio-228, ¶ 32 (insufficient evidence of retaliation offense where the defendant reported his desire to severely beat the judge, the prosecutor, and policemen to medical personnel while seeking help for his mental issues and was told his communications were confidential), citing *State v. Farthing*, 146 Ohio App.3d 720, 724-725, 767 N.E.2d 1242 (2d Dist.2001) (no evidence that a defendant who wrote a letter to a fellow inmate should have expected his intent to be communicated to the target mentioned therein).

**{¶58}** The state counters that the retaliation statute does not require that the threat be communicated directly to the person threatened. *See, e.g., See Farthing*, 146 Ohio App.3d at 724; *State v. Lambert*, 2d Dist. No. 16667 (June 5, 1998); *State v. Webb*, 2d Dist. No. 99CA74 (Aug. 4, 2000). Still, these cases proceed to hold that, in cases without direct communication to the victim, retaliation can be established where the defendant desires his threats to be communicated to the intended victim by the third person or he reasonably could have expected the threats to be so conveyed. *See id. See also State v. Glover*, 8th Dist. No. 96888, 2012-Ohio-165, ¶ 17; *State v. Welch*, 6th Dist. No. WD-07-057, 2008-Ohio-6540, ¶ 24; *State v. Roberts*, 1st Dist. No. C-890639 (Sept. 26, 1990). The question would become whether appellant should have reasonably expected the inmate he was allegedly hiring to become a snitch causing the police to tell the victim of the plan. However, we need not proceed any further on this topic.

**{¶59}** A conviction does not exist where there has been a guilty verdict or plea but no sentence. *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶ 12. *State v. Henderson*, 58 Ohio St.2d 171, 177-179, 389 N.E.2d 494 (1979). *See also* Crim.R. 32(B). Thus, where a disputed offense was merged with a greater offense, there is no conviction to vacate on appeal.

**{¶60}** The Supreme Court has concluded that, even if there is insufficient evidence to support one count, where that count has been merged with another

count, the error in rendering a verdict on that count is harmless beyond a reasonable doubt. *State v. Powell*, 49 Ohio St.3d 255, 263, 552 N.E.2d 191 (1990). This court has thus also held that where the trial court merged an offense into another offense that was based upon legally sufficient evidence, a jury verdict on a merged count that was not supported by sufficient evidence is harmless. *State v. Wolff*, 7th Dist. No. 07MA166, 2009-Ohio-2897, ¶ 3-4, 61, 70. *See also State v. Dew,* 7th Dist. No. 08MA62, 2009-Ohio-6537, ¶ 135 (even if a verdict on a count is contrary to the manifest weight of the evidence, if that count was disposed of by being merged into another offense, any error in rendering that verdict is harmless under *Powell*). Other districts have stated the same premise. *See, e.g., State v. Hubbard,* 8th Dist. No. 97118, 2012-Ohio-152, ¶ 29 (in disposing of sufficiency argument on kidnapping, court first noted that the kidnapping merged with the rape and suggested that the analysis could stop there); *State v. Washington*, 10th Dist. No. 09AP-424, 2009-Ohio-6665, ¶ 18 (court is not required to address appellant's sufficiency of the evidence challenge to the kidnapping offenses because the trial court merged those offenses into others).

**{¶61}** Here, the trial court merged the retaliation count into the greater offense of attempted aggravated murder. In accordance, appellant was sentenced to ten years on the attempted aggravated murder and was not sentenced for retaliation. Thus, his sufficiency argument regarding retaliation need not be addressed because, even assuming arguendo his contention here has merit, there exists no conviction for this court to vacate. In other words, any error would be harmless under *Powell*.

**{¶62}** For all of the foregoing reasons, appellant's first assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER TWO

**{¶63}** Appellant's second assignment of error alleges:

**{¶64}** "THE DEFENDANT/APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AS THE JURY CLEARLY LOST ITS WAY AND CREATED A MANIFEST MISCARRIAGE OF JUSTICE."

**{¶65}** Weight of the evidence deals with the inclination of the greater amount of credible evidence to support one side of the issue over the other. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). In reviewing a manifest weight of the evidence argument, the reviewing court examines the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.*

**{¶66}** A reversal on weight of the evidence is ordered only in exceptional circumstances. *Id.* In conducting our review, we proceed under the theory that when there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one should be believed. *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999).

**{¶67}** Rather, we defer to the fact-finder who is best able to weigh the evidence and judge the credibility of witnesses by viewing the demeanor, voice inflections, eye movements, and gestures of the witnesses testifying before it. *See Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984); *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). This is especially true after a jury trial where the appellate court is discouraged from sitting as "the thirteenth juror" and eliminating a jury verdict. *See Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. In fact, only a unanimous three judge panel can reverse a jury verdict on manifest weight grounds. Ohio Constitution, Art. IV, Section 3(B)(3).

**{¶68}** Appellant takes issue with the evidence regarding the car used in the robbery. The police broadcast alerted officers to a maroon or dark pink 1978 Lincoln with damage to the rear end, with no passenger lights. (Tr. 484, 687, 818, 823). Appellant points out that an officer testified that appellant's car looked brown in the photograph. (Tr. 497). A detective looking at the pictures stated that the car looks tan or champagne. (Tr. 820-821).

**{¶69}** We have the photograph of the car as an exhibit, and the car does appear more shimmering tan/beige than something close to maroon or dark pink. Still, no one testified that appellant's car looked tan or brown in real life. Rather, the testimony was that it looked like those colors in the photographic exhibits. Photographs do not always display the exact colors (and the pictures were taken in the daylight whereas the robbery took place after 7:00 p.m. at the end of December).

**{¶70}** Moreover, a police officer listening to the broadcast about the maroon or dark pink Lincoln with heavy rear end damage immediately recognized the description of the car and knew that it belonged to a tenant in an apartment where she also worked security. (Tr. 666). She went looking for the car, which she described as a "not lavender, not pink" late model Lincoln with heavy rear end damage. (Tr. 665). She stated that the car color was "weird" and "unique," adding "when you see it, * * * you just know it." (Tr. 677).

**{¶71}** Less than one hour after the robbery, she encountered the vehicle which in her opinion fit the description of the broadcast. (Tr. 667). That vehicle belonged to appellant, he was driving, and she recognized him as well. (Tr. 670). Moreover, a different officer, who conducted the vehicle inventory, variously characterized appellant's vehicle as maroon-colored, "sort of plum colored," or "plum, lavender." (Tr. 647, 649-651). And, she specified that appellant's car was not gold or brown. (Tr. 658).

**{¶72}** Appellant next complains that an initial report advised that the car had damage to the rear end and no lights on the passenger side, but the photographs show rear end damage to the driver's side. Appellant fails to recognize that the report generally stated rear end damage, and the photographs show that portions of the passenger side tail lights were broken out as well.

**{¶73}** Appellant also notes that the vehicle he was driving at the time of his arrest was a 1985, not a 1978, Lincoln. (Tr. 657). However, a 1978 Lincoln versus a 1985 Lincoln is not a major discrepancy in an estimate provided by a bystander (or even a police officer for that matter).

{¶74} Appellant then takes issue with the color of the robber's coat. The broadcast from the bystander reported a thick black coat with fur on the edges. (Tr. 687). The employee who crawled back into the kitchen after seeing the robber testified that he wore a black coat with fur around the hood. (Tr. 519). The victim testified that the robber wore a puffy black winter coat with fur around the hood. (Tr. 538, 543).

{¶75} The responding officer wrote that the victim described the coat as dark, maybe black, with brown fur around the hood. (Tr. 479). It was pointed out that this officer testified at the preliminary hearing that the video he watched showed a robber in a brown, puffy coat. (Tr. 500). The detective also watched the video, and his report characterized the coat as dark green. (Tr. 862). Appellant points out that photographs derived from the surveillance video suggest the puffy coat was dark green. (Tr. 509).

{¶76} However, the victim explained that the color was off in the photographs as the robber's coat was actually black. (Tr. 554, 572, 590). She noted that her work shirt looks green in the photograph but that it was actually dark green. (Tr. 554, 572). So, this is merely another matter of conflicting color shades in photographs. The people who saw the robber in person reported the coat to be black.

{¶77} In any event, no similar coat was recovered from appellant or his vehicle. The fact that appellant was arrested in a totally different coat with no hood less than an hour after the robbery is a more persuasive argument. (Tr. 864). However, it did not persuade the jury. A rational juror could conclude that the robbers stopped at a house or elsewhere and left the coat (and wave cap) behind.

{¶78} Next, appellant states that his booking photograph shows that he was clean-shaven, but the police who watched the video gained the impression that the robber in the video had a scruffy gray beard. However, the victim testified that the robber had no facial hair. (Tr. 543, 616). Appellant believes the victim's testimony on this matter lacks credibility and that she was trying to conform her testimony to appellant's booking photo.

**{¶79}** Yet, she did not report facial hair to the responding officer minutes after the robbery. And, only some of the photos derived from the video leave the impression of facial hair around the mouth, and they are fairly blurry. Moreover, the detective thought he noticed a scruffy grayish goatee in the video but noted that the video was not the best quality and was blurred. (Tr. 832, 862). The responding officer who watched the video stated that he got the impression not of a goatee but of a scruffy face that was merely unshaven with a 5:00 shadow. (Tr. 513). In fact, the booking photo does not actually show that appellant was perfectly clean shaven as he claims. There is an indication of some stubble around the mouth that may have a grayish tint. *See* State's Exhibit 14. This a matter best left for the jury.

**{¶80}** Appellant next takes issue with the victim's testimony that she could tell the robber was bald. (Tr. 610). Appellant notes that he is bald in his booking photo. He asks how the victim could say that the robber was bald if he was wearing a wave cap under his hood. The officer testified that the video shows the robber entered the store with his hood down and put it up as he approached the counter. (Tr. 505). The victim noted that she sometimes wears a wave cap to keep her hair down at work and insisted that she could see around the wave cap that the robber had no hair. (Tr. 614). This is also a credibility issue best left for the jury.

**{¶81}** Appellant's next argument deals with the victim's description of the robber's height and weight. The victim testified that when asked about these descriptors by the officer, she responded, "He's about as tall as you." (Tr. 542). From this answer, the officer wrote down that the robber was 6', 200 pounds. (Tr. 479). At trial, the victim testified that the robber was about 5'8", 200 pounds. (Tr. 542). When asked what description she provided at an earlier hearing, she replied, "5'8" about 238 pounds, something like that." (Tr. 609).

**{¶82}** The testimony from the 5'3" victim that the robber was about 5'8" is not some major flaw in the state's case as the defendant attempted to make it out to be at trial. The victim's initial estimate minutes after the robbery was that the robber was *about the same height of the responding officer*, whatever that may be. The officer's report stated the robber was 6' tall. From this, we can presume the officer was 6' tall.

In addition, the jury viewed this officer's height. They also viewed appellant's height. Plus, they heard the arresting officer, who recognized appellant from her other job as security at his apartment complex, testify that appellant appeared to be 5'10" or 5'11". (Tr. 674).

{¶83} As to weight, it is undisputed that the robber wore a puffy coat. As the victim explained, this made it difficult to judge his build. (Tr. 620). And, weight estimates are inevitably inaccurate, especially under a coat such as the one depicted in the photographs. The jury heard appellant's theory and found that these issues did not detract from the victim's identification of appellant's face.

{¶84} Appellant also asserts that the victim's identification lacks credibility because the detective did not hand the written instructions for the photographic array to the victim until after she circled appellant's photograph in the array, at which time he gave her the instruction sheet to sign and to write the robber's position in the blank. The officer clearly testified that although he did not hand her the sheet to read to herself before she saw the array, he did read the instructions to her before giving her the array. (Supp. Tr. 44-45, 58, 60-61, 69). The victim confirmed at trial that the officer told her the instructions before handing her the array, and she provided some examples of the instructions. (Tr. 548-549, 595-597, 606). Although the officer stated that he did not read the instructions verbatim, he clarified that the words he left out were merely "A, and, the, those, things of that nature." (Supp. Tr. 69).

{¶85} Also, contrary to appellant's argument (where he cites to page 45 in support), the officer did not originally state that he showed the instruction sheet to the witness prior to showing her the array. Rather, he answered, "yes" to the prosecutor's question which specifically asked him if he "read" the information in the instructions prior to showing her the arrays. (Supp. Tr. 45).

{¶86} Next, appellant urges that the victim's identification lacks credibility because she had difficulty identifying him at the preliminary hearing. As to the victim's identification at the preliminary hearing, appellant's prior attorney testified that the victim had some problems identifying him at the hearing. (Tr. 890). He

stated that appellant was in the courtroom before the hearing started and remained until it was over. (Tr. 884).

{¶87} The victim testified that when she was first asked to identify appellant, only the co-defendant was present at the table. (Tr. 578). She believed that officers then brought appellant in at which time she identified him. (Tr. 579, 583). She noted that appellant was seated in chairs on the wall, rather than at the table. (Tr. 581). The preliminary hearing transcript referred to at trial apparently shows that she did identify him and that he was seated somewhere irregular in the courtroom. (Tr. 580-581).

{¶88} Assuming appellant was present from the beginning of the hearing, the victim may not have thought to look for appellant throughout the entire courtroom. When asked if she saw him, she may have only looked at counsel table where the co-defendant was seated. This was a pertinent matter for appellant to raise at trial, and said matter was fully presented to the jury. Still the jury did not find it important enough to discredit the victim's identification. Notably, she had already identified appellant from a photo array two days after the robbery.

{¶89} The victim's credibility as to her identification of appellant was key to the robbery case. The jury occupied the best position to determine her confidence level regarding that identification and her sincerity of belief. Yes, she may be mistaken, but her ability to identify appellant as the robber who grabbed her arm, pointed a gun at her, and demanded money is a question for the fact-finders in this case. Her testimony was not unbelievable or incredible. People are not always accurate estimators of height and weight, but this does not mean that they cannot recognize a face two days after a robbery. And, placing appellant in an odd seat in a crowded courtroom when the co-defendant is sitting at the table could reasonably cause the victim to assume that if the defendant was not at the table, he must not be in the courtroom yet.

{¶90} Next, appellant takes issue with the fact that a great deal of DNA on the black gloves definitively belonged to co-defendant Jeffrey Shorter and that the portion that matched appellant's DNA was small and was not highly exclusive to

others. These gloves were found in appellant's car between the front seats. They are distinctive in that they have yellow labeling on the knuckles. The video of the robbery depicts gloves with a similar yellow area. In fact, after the responding officer watched the video, he specifically asked if gloves with a yellow stripe were found in the car. (Tr. 488).

{¶91} The gloves were sent for DNA testing, which revealed a strong match with co-defendant Jeffrey Shorter in a large amount and a lesser amount of DNA from another person. Appellant's DNA could not be excluded as that other DNA source, but the statistics were not strong as 1 in 50 people could have been the contributor. (Tr. 778-781). The state elicited an answer which suggested that the amounts of DNA recovered could be consistent with Shorter wearing the gloves routinely and appellant wearing them for the minutes it took for the robbery. (Tr. 781). The jury heard the testimony and the statistics. The DNA evidence regarding appellant was not very inculpatory, but it does not indicate a verdict that is contrary to the weight of the evidence.

{¶92} Finally, regarding the attempted aggravated murder conviction, the inmate testified that appellant told him the victim was short, with blond hair and glasses. The inmate stated that appellant told him she was "thick" but that there was a bigger lady who worked there. (Tr. 701). When it was appellant's turn to cross-examine the inmate, he asked the inmate to look at a woman in the back of the courtroom (the victim). The inmate described the indicated woman as "kind of like brunette, brown" hair and said that she was not wearing glasses. (Tr. 717).

{¶93} Appellant urges that this shows the testimony of the fellow inmate lacked credibility because he had the victim's description wrong. He also points out that the inmate admitted that he reviewed appellant's court documents while in jail where he could have discovered the victim's name and place of employment. We note that a photographic exhibit of the robbery suggests the victim's hair had blond ends. In any event, the trial took place more than two years after the robbery. It is not unusual for a person to change their hair color and switch from glasses to contacts.

{¶94} The jurors were present to observe this inmate's gestures. They were in the best position to evaluate his general demeanor as he was questioned by counsel and by appellant who represented himself. That is, they watched the former inmate engage in colloquy with appellant, the very person he was accusing. The jurors could see if the inmate's eye movements seemed furtive or if he was sweating or fidgeting, and they could study his voice inflections. The credibility of the inmate is a question best left for the jury.

{¶95} In conclusion, we reviewed the entire transcript and viewed the exhibits. We evaluated the competing theories of the state and the defense and considered the competing inferences. There exists more than one reasonable view of the evidence here. Appellant's defense theory is believable, but the state's case is not unbelievable. We find no manifest miscarriage of justice. This assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER THREE

{¶96} Appellant's third assignment of error contends:

{¶97} "THE TRIAL COURT ERRED IN FAILING TO SUPPRESS THE IDENTIFICATION TESTIMONY OF [THE VICTIM]."

{¶98} In reviewing a suppression decision, the general rule is that the trial court is in the best position to resolve questions of fact and evaluate the credibility of witnesses. *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992), citing *State v. Fanning*, 1 Ohio St.3d 19, 20, 437 N.E.2d 583 (1982). Our standard of review requires us to determine whether the trial court's findings are supported by competent, credible evidence. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 100. Then, we independently determine whether the trial court applied the appropriate legal standard. *Roberts*, 110 Ohio St.3d 71 at ¶ 100 (mixed question of law and fact).

{¶99} When a witness has been presented with a suspect before trial, due process requires a court to suppress the identification if the presentation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under all of the circumstances. *State v. Waddy*, 63 Ohio St.3d 424, 438, 588 N.E.2d

819 (1992), citing *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Both parts of the test must be satisfied by a defendant challenging a lineup. *See id.* Thus, if the presentation was not unduly suggestive, the court need not proceed any further in the test. *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 19; *State v. Murphy*, 91 Ohio St.3d 516, 534, 747 N.E.2d 765 (2001).

{¶100} Likewise, even if the presentation was unnecessarily suggestive, the identification can still stand if it is reliable under the totality of the circumstances. *Waddy*, 63 Ohio St.3d at 438-439. An identification is unreliable if there is a very substantial likelihood of irreparable misidentification. *Id.* at 439. Factors determining the degree of reliability include: the opportunity of the witness to view the perpetrator during the crime, the witness's degree of attention, the accuracy of the witness's prior description, the level of certainty demonstrated by the witness at the presentation, and the length of time between the crime and the presentation. *Id.* at 439.

{¶101} Appellant filed a motion to suppress the victim's identification of appellant as the robber. The court held a suppression hearing and thereafter denied the motion to suppress. Appellant reiterates his argument here about the instructions being handed to the victim only after the identification. We disposed of this argument in the prior assignment where we noted that the officer and the victim testified that he *read* the instructions to her prior to providing her with the array. (See Assignment of Error Number Two for full discussion.)

{¶102} Appellant then contends that the photographic array was unnecessarily suggestive, claiming: his shirt is distinctive; he has no facial hair while most of the other men in the array have facial hair; and there are only two who are both bald and have no facial hair. First, we cannot say that appellant's shirt is unnecessarily suggestive in a way that would lead the witness to pick him out. In fact, the most distinctive shirt is on the man wearing a silky black shirt with white stripes with opposing stripes trimming the neck line. Another man is wearing a bright blue shirt with a red lanyard around his neck. Three others have neutral shirts. Appellant's shirt is not similar to jail garb or even something said to be worn by the robber.

Appellant is wearing a plain white tank top. The color is neutral and non-distinctive. He apparently believes the style is unusual.

{¶103} Police compiling the line-up would likely be hard-pressed to find other fifty-year-old men wearing white tank tops for their driver's license or state identification card photographs. People wear different shirts when they get their official picture taken for an ID card or a booking photo; these shirts can eventually show up in a line-up when a computer randomly chooses them out of the database. There is no rule that all people in the array be wearing a shirt similar to the defendant's shirt. In fact, pursuant to operating policy, the officer told the victim that she was to disregard any clothing. (Tr. 548-549, 595-597, 606); (Supp. Tr. 44-45, 58, 60, 69). This argument is without merit.

{¶104} As for baldness, all six of the men are at least mostly bald because that was a parameter entered in the computer program by the detective. Three (including appellant) appear totally bald. One may or may not have some bristle on the sides, and two others do have short but noticeable hair on the sides. Nothing is suggestive about the states of baldness. And, it is not unusual for someone with a bit of hair at the time of a prior photograph to shave their remaining hair thereafter. Finally, the witness was told to disregard temporary features and hair and to focus on permanent features such as nose shape and size, mouth, jaws, and ears. *See id.*

{¶105} As for facial hair, appellant states that his picture is distinctive because he is clean-shaven in the array. Appellant questions whether the man in position 3 is clean-shaven. However, the victim characterized that man as lacking facial hair. (Supp. Tr. 31). If appellant can question whether the man in position 3 is clean-shaven, then we can similarly question whether appellant is totally clean-shaven in the array as he states. One could conclude that there is a bit of stubble around appellant's mouth, just as appellant believes there is some around position 3's mouth. Yet another man has some sparse facial hair in a narrow goatee shape. Three others have fuller goatees. Once again, the witness was told to disregard temporary features. Appellant is not a focal point in the array due to facial hair or a lack thereof.

{¶106} In conclusion, the individuals in the photographs in the lineup need not have nearly identical features. *State v. Murphy*, 91 Ohio St.3d 516, 534, 747 N.E.2d 765 (2001); *State v. Davis*, 76 Ohio St.3d 107, 112, 666 N.E.2d 1099 (1996) (defendant was only one in lineup with bushy, curly hairstyle). The array here was not unnecessarily suggestive as appellant claims. Thus, we need not continue to address unreliability.

{¶107} Even if we were to address reliability, it cannot be said that the victim's identification was unreliable in such a manner that her identification should have been suppressed rather than presented to the jury for an evaluation of her credibility. Appellant focuses on the fact that the victim did not immediately identify him at the preliminary hearing. He was apparently seated somewhere on the side of the courtroom. The victim soon identified him when she noticed him. She explained at suppression that she did not notice him in the courtroom at first. (Supp. Tr. 25). Her trial testimony suggested that she was looking at counsel table and noticing that only the co-defendant was seated there and not appellant (or that appellant entered the room after the first question was asked). (Tr. 577, 579, 582-583).

{¶108} A failure to immediately notice the defendant seated against a side wall in the second row of chairs at a preliminary hearing in a crowded courtroom does not indicate that a prior photographic identification is unreliable. This situation does not indicate a "very substantial likelihood of irreparable misidentification." *See Waddy*, 63 Ohio St.3d at 439. As aforementioned, factors determining the degree of reliability include: the opportunity of the witness to view the perpetrator during the crime; the witness's degree of attention; the accuracy of the witness's prior description; the level of certainty demonstrated by the witness at the presentation; and the length of time between the crime and the presentation. *Id.* at 439.

{¶109} Here, the length of time between the crime and the photographic identification was less than 48 hours. There is no indication that she was uncertain about her identification. (Supp. Tr. 11-12). The accuracy of her prior description was acceptable: the height and weight of the responding officer, which was 6' and 200 pounds (taking into consideration the heavy coat), dark-complected black man, about

50 years of age, and bald with no indication of facial hair. As aforementioned, the arresting officer estimated that appellant may have been 5'11' and 190 pounds at the time of his arrest. And, the trial court as the fact-finder could ascertain what appellant looked like at the suppression hearing. Finally, the witness had the opportunity to view the robber during the crime as he was directly in front of her grabbing her arm and speaking to her and she was paying a high degree of attention to him at that time, testifying that she was concentrating on his facial features. (Supp. Tr. 5-7). The trial court, who viewed the officer and victim testify, could have reasonably found the identification was reliable, allowing the matter to be submitted to the jury.

{¶110} This assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER FOUR

{¶111} Appellant's fourth assignment of error provides:

{¶112} "THE TRIAL COURT ERRED IN HEARING THE WEAPONS UNDER DISABILITY CHARGE AND THE REPEAT VIOLENT OFFENDER SPECIFICATION WITHOUT A JURY AND LACKED JURISDICTION TO TRY DEFENDANT/APPELLANT FOR THOSE OFFENSES."

{¶113} On July 22, 2010, appellant filed a motion to sever the weapons under disability count from the trial of the aggravated robbery. The state responded that the counts were properly joined because they were based upon the same transaction and the same evidence had to be presented on appellant's possession of the firearm. The state pointed out that if the defendant wished to stipulate to the certified copy of his prior conviction, no testimony would be required on the weapon under disability charge at the jury trial. At a suppression hearing in January of 2011, the court orally granted appellant's motion to separate the weapon under disability count and journalized that severance on February 4, 2011. (Tr. 72-73). No reference to a jury trial waiver was made in the motion, at the hearing, or in the entry.

{¶114} On October 4, 2011, the court issued another judgment entry, stating that at a September 23, 2011 pretrial, the defendant orally moved to bifurcate the weapon under disability count. The court's entry then sustained the motion and stated that the weapon under disability count would be tried to the court after the

conclusion of the jury trial for aggravated robbery, suggesting that a jury waiver was orally entered at that pretrial, the transcript of which has not been provided to this court and may not have been recorded.

**{¶115}** Thereafter, the inmate advised police of appellant's alleged plan. Thus, the indictment was amended to add the repeat violent offender specification (attached to the new attempted aggravated murder count). As set forth in assignment of error number one as to the weapon under disability charge and the repeat violent offender specification, the trial court declared during trial: "What we put on the record and what we agreed to was, and I am hearing those two charges simultaneously with the jury, and there's an agreement and stipulation that the underlying charge, that there is a previous conviction, et cetera." The prosecutor responded, "Correct." (Tr. 794). The defense made no comment.

**{¶116}** Thereafter, the prosecutor stated: "Parties have agreed that State's Exhibit 19, which is a judgment entry and sentence regarding Stanley Croom, showing his conviction of murder and aggravated robbery in 1983, that shall be used for purposes of his weapon under disability charge and prior crime of violence specification that the judge is making the decision on, not the jury. * * * They are moved by the state into evidence and will not go to the jury, just for the judge" (Tr. 905-906).

**{¶117}** Again, the defense made no comment. After trial, the court filed a judgment entry on February 13, 2012, finding appellant guilty of having a weapon while under disability and of being a repeat violent offender. This entry states that the parties agreed to sever these charges from the aggravated robbery with a firearm specification, the attempted aggravated murder, and the retaliation charges. The entry further provides that the defendant waived his right to a jury trial on the weapon under disability and the repeat violent offender specification. The court's March 1, 2012 sentencing entry reiterates that the weapons under disability count and the repeat violent offender specification were bifurcated prior to trial.

{¶118} On appeal, appellant alleges that Crim.R. 23(A) and R.C. 2945.05 were violated because the record does not show appellant expressly waiving his right to a jury and there is no written waiver signed by the defendant and filed.

{¶119} "In serious offense cases the defendant before commencement of the trial may knowingly, intelligently and voluntarily waive in writing his right to trial by jury." (Emphasis added). Crim.R. 23(A) (such waiver may also be made during trial with the approval of the court and the consent of the prosecuting attorney). The manner of the waiver is then statutorily set forth: "In all criminal cases pending in courts of record in this state, the defendant may waive a trial by jury and be tried by the court without a jury. Such waiver by a defendant, shall be in writing, signed by the defendant, and filed in said cause and made a part of the record thereof." (Emphasis added). R.C. 2945.05.

{¶120} Moreover, the written waiver shall be entitled in the court and cause and must state in substance : "I  ___, defendant in the above cause, hereby voluntarily waive and relinquish my right to a trial by jury, and elect to be tried by a Judge of the Court in which the said cause may be pending. I fully understand that under the laws of this state, I have a constitutional right to a trial by jury." R.C. 2945.05. In addition, "Such waiver of trial by jury must be made in open court after the defendant has been arraigned and has had opportunity to consult with counsel." R.C. 2945.05.

{¶121} We initially dispose of the argument regarding the repeat violent offender specification. The Supreme Court has ruled that R.C. 2945.05 does not apply to a request for the trial court to determine other specifications involving prior convictions where there was a jury trial on the underlying charges in the indictment. *State v. Nagel*, 84 Ohio St.3d 280, 285-286, 703 N.E.2d 773 (1999), addressing the specifications in former R.C. 2941.142 and R.C. 2941.143.

{¶122} The Court focused on the language in R.C. 2945.05, "[i]n all criminal cases" and pointed out that a prior conviction specification depends on the underlying charge in the criminal action and is not its own criminal case. *Id.* at 286. The Court also noted that the language of the specification at issue in that case provided, "the

defendant may request that the trial judge, in a case tried by a jury, determine the existence of the specification at the sentencing hearing." *Id.* The Court concluded that reading R.C. 2945.05 with the specification statutes, it was clear that the requirements for jury waivers do not apply to the specifications. *Id.*

**{¶123}** The specification here provides: "The court shall determine the issue of whether an offender is a repeat violent offender. R.C. 2941.129(B). Reading R.C. 2945.05 with this specification, the requirements for a jury waiver in R.C. 2945.05 do not apply to the repeat violent offender specification. *See State v. Samuel*, 10th Dist. No. 11AP-158, 2011-Ohio-6821, ¶41-42 (written jury waiver not required for court to properly try repeat violent offender specification).

**{¶124}** In fact, the *Foster* Court recognized that courts, not juries, determine repeat violent offender specifications, and in order to cure any violation of the general right to a jury, the court severed certain judicial fact-finding requirements of that specification. *See State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, ¶ 74-78, 99 (after severance, judicial fact-finding is no longer required for repeat violent offender specification). *See also State v. Hunter*, 123 Ohio St.3d 164, 2009-Ohio-4147, 915 N.E.2d 282, ¶ 34-36. Accordingly, we overrule appellant's argument that the trial court erred in ruling on the repeat violent offender specification after the jury trial on the underlying offense where there was no signed jury waiver filed.

**{¶125}** This leaves us to evaluate the propriety of the court trying the weapon under disability charge. Having a weapon while under disability is an actual offense, and thus, the above analysis regarding the repeat violent offender specification does not apply.

**{¶126}** As aforementioned, when a criminal defendant elects to waive the right to trial by jury, R.C. 2945.05 mandates that the waiver must be in writing, signed by the defendant, filed in the criminal action, made part of the record of the case, and made in open court. *State v. Lomax*, 114 Ohio St.3d 350, 2007-Ohio-4277, 872 N.E.2d 279, ¶ 9. There must be strict compliance with R.C. 2945.05 for there to be a waiver of the right to a jury trial, and if there is not strict compliance, then the trial

court was prohibited from conducting a non-jury trial. *State v. Pless*, 74 Ohio St.3d 333, 337, 339, 658 N.E.2d 766 (1996).

{¶127} In *Pless*, the defendant agreed to waive his right to a jury trial in open court in the presence of his attorneys, it was stated on the record that he signed a written jury waiver, and the trial court issued an entry specifying that the defendant had waived his right to a jury in the capital case and agreed to be tried by a three-judge panel. *Id.* at 339. In spite of the significant evidence of the defendant's jury waiver, the Supreme Court reversed on the grounds that the record contained no evidence that the signed waiver was ever filed and made a part of the record. *Id.* The Court stated that R.C. 2945.05 was clear and unambiguous on the requirements for a jury waiver and that substantial compliance was not acceptable. *Id.* at 337, 340.

{¶128} Here, the state's and the trial court's aforequoted placement of the agreement and stipulation on the record was not followed by any response by appellant. In order to meet the open court prong of jury waiver, there must be "some evidence in the record of the proceedings that the defendant acknowledged the waiver to the trial court * * *." *Lomax*, 114 Ohio St.3d 350 at ¶ 42. Even if there had been a sufficient open court waiver at the recorded pretrial (which was not provided to this court and which may not have even been recorded), open court waivers alone do not satisfy the statute. *See Pless*, 74 Ohio St.3d 333 at fn.2 (for the text of the oral discussion of that defendant's on-the-record waiver). There are four other parts of the jury waiver test.

{¶129} As the state's brief points out, a motion for severance was written, filed, and made part of the record. Yet, it was signed by counsel (not the defendant). In any event, it does not mention waiver of a jury trial. Severance and waiver of a jury trial are not synonymous. *See* Crim.R. 14 versus Crim.R. 23(A). Thus, the written motion and any oral statements regarding mere severance are not dispositive of our strict compliance evaluation.

{¶130} Next, we recognize that the trial court filed a judgment entry long before trial memorializing a jury waiver on the weapon under disability charge. And, we have a judgment entry filed after the jury trial on the other charges reiterating that

jury waiver. However, *there is no indication in the record that a written waiver was ever signed by appellant and thus it was also not filed or made a part of the record.* As such, there has not been strict compliance with R.C. 2945.05.

{¶131} In *Pless* and the cases reviewed therein, it is clear that a defendant does not waive or invite the error as the state contends in its appellee's brief. *See Pless*, 74 Ohio St.3d 333. This court has also held that invited error is not a valid argument by the state on appeals involving a lack of strict compliance with R.C. 2945.05. *State v. Harrison*, 7th Dist. No. 02CA157, 2004-Ohio-2933, ¶ 41-43.

{¶132} One could ask whether the Supreme Court would insist on strict compliance where there is only partial waiver as a jury trial was only waived for one of the offenses contained in the indictment and a hybrid bench/jury trial ensued, especially where a motion for severance was filed and where the offense tried to the court is one involving a prior conviction with the other element essentially being tried by the jury (as the jury tried appellant on aggravated robbery with a firearm specification). Such an exception would be contrary to the results of other appellate courts, which have proceeded with the strict compliance test in similar situations. *See, e.g., State v. Anderson*, 8th Dist. No. 94218, 2010-Ohio-5593 (state conceded error and appellate court reversed where appellant had jury trial on multiple counts after waiving jury trial on weapons under disability count where there was no written waiver signed or filed). *See also State v. Webb*, 10th Dist. No. 10AP-289, 2010-Ohio-6122, ¶ 3, 21-23 (strict compliance test applied where jury waiver filed only for weapon under disability count); *State v. McCauley*, 8th Dist. No. 80630, 2003-Ohio-3211, ¶ 3, 5-6 (proceeding under the strict compliance test when addressing sufficiency of jury waiver for only weapon under disability charge in a multi-count indictment case). We conclude that any decision to create such an exception to Supreme Court law should come from that court. We shall not assume the waiver of such a fundamental right that must by law be made in open court and in writing and filed with the court as part of the record.

{¶133} This assignment of error is sustained in part. We uphold the repeat violent offender specification but reverse the weapon under disability conviction and remand for further proceedings thereon.

## PROPOSED ASSIGNMENTS OF ERROR

{¶134} Appellate counsel filed a hybrid brief containing four fully briefed assignments of error and then listing five "*Anders* assignments of error," which counsel opined had no merit but which appellant had asked counsel to brief. Counsel set forth brief arguments in support of the assignments proposed by appellant and cited to some law and the record. Appellant asked this court for the trial transcripts in order to file a supplemental brief. This court denied that request but administratively ruled that the court would review the additional assignments set forth in counsel's brief.

{¶135} The state's brief did not address these mere proposed assignments and asks for guidance on how to proceed in a hybrid brief case. As the state urges, if we were to find an *Anders* assignment of error potentially has merit, we would appoint counsel to brief the issue for the defendant and the state would then have a chance to respond to any new appellant's brief. However, we do not find potential merit in any of the proposed assignments. Before demonstrating this absence of potential merit, we stop to discuss the irregularities of a hybrid brief and to state our future prohibition on such a brief.

{¶136} A criminal defendant has a right to act pro se or to have counsel, but he has no right to "hybrid representation." *See State v. Thompson*, 33 Ohio St.3d 1, 6-7, 514 N.E.2d 407 (1987) (thus defendant cannot act as co-counsel at trial). *Anders* deals with the situation where counsel finds the case to be "wholly frivolous" and thus seeks to withdraw. *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967). The holding does not pertain to a case where counsel finds many issues require briefing and the client wishes counsel to brief more issues, which counsel finds frivolous.

{¶137} Notably, appellate counsel need not raise every possible issue in order to render constitutionally effective assistance. *State v. Tenace*, 109 Ohio St.3d 451,

2006-Ohio-2987, 849 N.E.2d 1, ¶ 7, citing *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). In fact, counsel is expected to focus on strong arguments and winnow out the weaker ones. *State v. Adams*, 7th Dist. No. 08MA246, 2012-Ohio-2719, ¶ 8-12, citing *Jones*, 463 U.S. at 751–752 ("Multiplicity hints at lack of confidence in any one [argument]"). We thus conclude that a hybrid brief is improper.

{¶138} Other courts have also found such a hybrid brief to be improper, thus striking the "*Anders* assignments." *State v. Vaughn*, 2d Dist. No. 1564, 2002-Ohio-4975, ¶ 4; *State v. Saaty*, 10th Dist. No. 96APA06-777 (Mar. 4, 1997). Although appellate courts have sometimes permitted a defendant to brief the "*Anders* assignments," this does not mean the court must do so. *See State v. Myles*, 2d Dist. No. 21451, 2007-Ohio-189, ¶ 2-3, 16 (and stating that although they mistakenly permitted the defendant to supplement, it was not done pursuant to *Anders* and thus no independent review of the record would occur); *State v. White*, 71 Ohio App.3d 550, 551-552, 594 N.E.2d 1087 (4th Dist.1991) fn. 1 (stating that the pro se brief was improper, but the court would "choose" to address it).

{¶139} In fact, the Second District noted that it was only considering the supplemental assignments because it had made the administrative "mistake" of allowing the defendant to brief the "*Anders* issues" as counsel had fully briefed other issues. *Myles*, 2d Dist. No. 21451 at ¶ 16-17. This is the scenario we have before us now.

{¶140} Counsel did not find the appeal wholly frivolous as he briefed four assignments, some with multiple parts, and he did not seek to withdraw. Thus, the five proposed assignments outlined and found frivolous by counsel are not actually "*Anders* assignments" and need not be addressed by this court. App.R. 16 allows a brief, a response, and a reply and provides that no further briefs will be allowed without leave of court. This court did administratively rule that we would review the additional assignments of error set forth in counsel's brief. Due only to that entry, we shall continue our analysis and explain why counsel was correct in finding that assignment of the additional claims would have been frivolous.

## PROPOSED ASSIGNMENT OF ERROR NUMBER ONE

{¶141} The first claim set forth as being an issue appellant wished counsel to brief is:

{¶142} "THE PROSECUTION WITHHELD EXCULPATORY EVIDENCE."

{¶143} Due process requires that the prosecution provide the defendant with any evidence that is material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). There is a *Brady* violation when the evidence that was not disclosed "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *State v. Ketterer*, 126 Ohio St.3d 448, 935 N.E.2d 9, ¶ 23, quoting *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

{¶144} Appellant believes that the state withheld a video of another robbery that would exculpate him here. His counsel states that there is nothing in the record as to this video, what it would show, or how it would help appellant's case.

{¶145} At the sentencing hearing, the attorney for co-defendant Shorter noted that he was also Mr. Shorter's attorney in another case pending before the court and asked that new counsel be appointed in that case. (Tr. 15-16). Mr. Shorter explained that his pending case was for an aggravated robbery at Walgreens. (Tr. 16). Later, appellant stated that the prosecutor knows he is not guilty because she indicted someone else for the Walgreens robbery based upon the same photographs used in this case. (Tr. 26).

{¶146} In referring to his co-defendant's other robbery charge at sentencing, appellant made no mention of a video and did not allege a lack of disclosure. Thus, his claim on appeal concerns items outside of the record, which cannot be addressed on appeal. *See State v. Ishmail*, 54 Ohio St.2d 402, 405-406, 377 N.E.2d 500 (1978).

{¶147} Moreover, there is no indication that the information was unknown to the defense during trial. *Brady* involves the discovery of information which had been known to the prosecution but unknown to the defense. *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

{¶148} Finally, materiality is not discernible from the record before us. There is no indication on the record of how a video of another robbery would exculpate appellant in the current offense where the victim identified him as the robber. As such, counsel properly refrained from addressing this issue on direct appeal.

PROPOSED ASSIGNMENT OF ERROR NUMBER TWO

{¶149} The second claim set forth as being an issue appellant believes has merit is:

{¶150} "THE TRIAL COURT ERRED BY DENYING DEFENDANT/APPELLANT'S MOTION TO COMPEL PHONE RECORDS."

{¶151} The day before trial, appellant filed a motion to compel phone records from the county jail and asked that the Sheriff be compelled to release phone records pertaining to a certain pod from December 1-5, 2011. The court denied the motion.

{¶152} The mention of jail telephone calls occurred in the testimony of appellant's former fellow inmate, who related the plan to eliminate the victim in the robbery. It appears that appellant desired the phone records to establish that the inmate had appellant's sister's telephone number early in December (rather than on December 28, the day the inmate left for his court hearing). Appellant wanted to show that the inmate called his girlfriend and asked her to call appellant's sister on three-way calling.

{¶153} As the inmate admitted that appellant previously utilized the telephone number as appellant urged, there is no issue here. (Tr. 726-729). The inmate insisted that appellant told him the number on the earlier day and later physically provided him with the number on a paper on the day of the inmate's court hearing. The phone records would not have established what day appellant handed the inmate a piece of paper with his sister's number on it.

{¶154} This is all the record shows regarding the relevancy of the jail telephone records. And, appellant failed to make a proffer to the court of what more could have been gleaned from the records sought the day before trial. Finally, a motion to compel production of phone records is typically to be used after a

subpoena fails to produce the results sought, and the motion did not explain the purpose of the records.  Counsel properly refrained from pursuing this issue.

PROPOSED ASSIGNMENT OF ERROR NUMBER THREE

**{¶155}** The third claim set forth as being an issue appellant believes has merit is:

**{¶156}** "THE TRIAL COURT JUDGE WAS BIASED AGAINST THE DEFENDANT/ APPELLANT."

**{¶157}** Counsel insists there is nothing in the record to indicate the trial judge was biased.  As counsel points out, the record shows that the judge was patient and accommodating to this pro se defendant throughout the jury trial and at sentencing. We reviewed the entire trial record in conducting our weight and sufficiency reviews. We also reviewed the parties opening statements and closing arguments.

**{¶158}** There is nothing indicating bias on the record.  And, the record is all that can be reviewed in a direct appeal.  *See, e.g., State v. Hill*, 90 Ohio St.3d 571, 573, 740 N.E.2d 282 (2001), citing *State v. Ishmail*, 54 Ohio St.2d 402, 377 N.E.2d 500 (1978); *State v. Alicea*, 7th Dist. No. 99CA36, 2002-Ohio-6907, ¶ 35.

**{¶159}** We also note that no affidavit of disqualification was filed in the Ohio Supreme Court pursuant to R.C. 2701.03, and the appellate court generally lacks jurisdiction to void judgments based upon bias.  *See Beer v. Griffith* (1978), 54 Ohio St.2d 440, 441-442, 377 N.E.2d 775 (1978).  As nothing on the record shows that the judge's behavior could have prejudiced the jury (nor were comments made to the defendant on the record), an actual bias argument to this court would be misplaced. *Compare State v. Wade*, 53 Ohio St.2d 182, 188, 373 N.E.2d 1244 (1978).  Hence, counsel properly refrained from briefing this issue.

PROPOSED ASSIGNMENT OF ERROR NUMBER FOUR

**{¶160}** The fourth claim set forth as being an issue appellant believes has merit is:

**{¶161}** "THE DEFENDANT/APPELLANT'S RIGHTS WERE VIOLATED UNDER BATSON V. KENTUCKY BECAUSE OF THE REMOVAL OF AN AFRICAN

AMERICAN FROM THE JURY PANEL USING A CHALLENGE FOR CAUSE [sic] [peremptory challenge].”

{¶162} One African American venireperson reported that his son had appeared before this court for a criminal offense and had recently finished probation. (Tr. 318-320). The juror was present for “every day” of his son’s criminal proceedings involving this same judge and this same assistant prosecutor. (Tr. 318). As a result, the prosecutor exercised a peremptory challenge as to this juror. (Tr. 322-323). The reason was agreed to be race-neutral. (Tr. 342). Defense counsel for the co-defendant specifically stated that they did not disagree that there was a race-neutral reason. (Tr. 342). When appellant was asked if he had anything to add, he said, “I’m all right.” (Tr. 344).

{¶163} Another African American venireperson had been charged in the Mahoning County Common Pleas Court with felony police retaliation. He pled to misdemeanor aggravated menacing and was placed on probation for a year, which he was still on at the time. (Tr. 364, 368-369). Co-defendant’s counsel wanted the juror to stay. (Tr. 376). Appellant opined that he did not care either way whether this juror stayed or did not. (Tr. 376, 378). The state then exercised a peremptory challenge. (Tr. 380-381).

{¶164} The prosecutor added that the potential juror minimized his behavior and disclosed that the potential juror and another person put a gun to the head of a juvenile and when their vehicle was stopped by police, there was a gun in the backseat. (Tr. 381). It was due to that arrest that the juror threatened the officer, his wife, and his daughter on Facebook, resulting in the charge for which the venireperson was on probation. (Tr. 381-382). The prosecutor also believed that when the juror left the courtroom, he saw the juror indicate to appellant with an affirmative nod in his direction. (Tr. 376-377).

{¶165} A claim of racially discriminatory use of a peremptory challenge is subject to the three steps set forth in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). First, the opponent of the peremptory challenge must make a prima facie case of racial discrimination, which is accomplished by merely

showing that the juror is African American. *Id.* at 96–98. Then, the proponent of the challenge must provide a racially neutral explanation for the challenge. *Id.*

**{¶166}** A race-neutral explanation for a peremptory challenge is simply "an explanation based on something other than the race of the juror." *Hernandez v. New York*, 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). It need not rise to the level of a challenge for cause. *Batson*, 476 U.S. at 97. In fact, it has been stated that the explanation need not be persuasive as long as the reason is comprehensible and is not inherently discriminatory. *Rice v. Collins*, 546 U.S. 333, 338, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006).

**{¶167}** If the proponent provides a race-neutral explanation, the trial court must view all the circumstances and determine whether the explanation is merely pretextual and thus whether there was purposeful discrimination. *Id.* at 98. Although this step entails evaluating the persuasiveness of the proponent's explanation, the burden of persuasion regarding racial motivation rests on the opponent of the challenge. *Rice*, 546 U.S. at 338. Because the decision is largely based upon credibility, we defer to the trial court and do not reverse absent a clearly erroneous decision. *See State v. Frazier*, 115 Ohio St.3d 139, 2007–Ohio–5048, ¶ 64; *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, ¶ 110.

**{¶168}** The trial court was in the best position to evaluate the statements of the prosecutor and also those made by the juror during voir dire. The state provided race-neutral reasons. Importantly, appellant had no issue with the peremptory challenges. As to the exclusion of one juror, he stated he was "all right" and as to the exclusion of the other juror, he stated that he did not care either way. The trial court's decision on this matter could not be considered clearly erroneous. There was no reason for counsel to brief this issue, and counsel properly concluded the claim on appeal would be frivolous.

PROPOSED ASSIGNMENT OF ERROR NUMBER FIVE

**{¶169}** The final claim set forth as being an issue appellant believes has merit is:

**{¶170}** "THE TRIAL COURT ERRED BY DENYING THE ADMISSION INTO EVIDENCE OF THE WRITTEN STATEMENT OF CO DEFENDANT JEFFREY SHORTER."

**{¶171}** On July 7, 2011, appellant filed a motion to dismiss. He attached a written statement he claimed was that of his co-defendant, which stated that the robbery was committed by his brother, Semmie Shorter, rather than appellant. The statement claimed: Semmie was driving appellant's car but got high so asked Jeffrey to drive; they drove to Belleria; he did not know his brother was going to rob the place but thought he was picking up food; he did not know his brother had a gun; when his brother exited the store, he said the prices were too high; and the pictures derived from the video surveillance show his brother robbing the store.

**{¶172}** First, counsel states that there is no indication in the record that the co-defendant's statement was offered for introduction at trial. A court's refusal to dismiss a case prior to trial based upon a written statement allegedly written by a co-defendant's is not a ruling on admissibility.

**{¶173}** In fact, even had a pretrial motion in limine ruling been made regarding the statement, this would have only been a preliminary, anticipatory ruling. *See State v. Grubb*, 28 Ohio St.3d 199, 201–202, 503 N.E.2d 142 (1986) (a decision on a motion in limine is a tentative, interlocutory, precautionary ruling by the trial court reflecting its anticipatory treatment of an evidentiary issue and is not a final determination as the trial court can change its mind at trial where the issue is presented in testimonial context). In order to preserve any objection to a court's pretrial ruling, the defendant would have had to raise the issue again at trial. *See State v. Hill*, 75 Ohio St.3d 195, 202-203, 661 N.E.2d 1068 (1996) (the denial of a motion in limine does not preserve a claimed error for review in the absence of the defendant making a contemporaneous objection to the actual admission of the evidence at trial).

**{¶174}** Moreover, there is no indication that appellant had evidence that the statement is what he claimed it was. That is, had it been offered, the written statement would not have been admissible on its own. There would have to be

testimony that the statement is what it was claimed to be. In any event, the statement does not expose the declarant to criminal liability as it exculpates both appellant and the speaker and blames another. *See* Evid.R 804(B)(3) (a statement by an unavailable declarant is admissible if, at the time of its making, it so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true and corroborating circumstances clearly indicate the truthworthiness of the statement). Consequently, counsel properly refused to raise this issue as an assignment of error.

**{¶175}** For the foregoing reasons, the weapon under disability conviction is reversed and the matter is remanded for further proceedings thereon. The convictions on the other offenses are upheld.

Donofrio, J., concurs; see concurring Opinion.
DeGenaro, P.J., concurs.

DONOFRIO, J. concurring.

**{¶176}** I concur with the judgment and opinion of the court with the exception of the court's conclusion that because a "hybrid" brief is improper, we will no longer consider "*Anders*" assignments of error in "hybrid" briefs. The court explains that the only reason it is considering the *Anders* assignments in this case is due to a prior administrative ruling that we would review them. Regardless of the prior administrative ruling, I would address the *Anders* assignments as this court has done in the past in similar cases. See *State v. Williams*, 7th Dist. No. 10-MA-13, 2011-Ohio-2463; *In the Matter of H.M.*, 7th Dist. No. 11-NO-381, 2011-Ohio-6376; *State v. Tusin*, 7th Dist. No. 10-MA-29, 2011-Ohio-2629; *In re K.B.*, 7th Dist. No. 10-BE-13, 2010-Ohio-6083; *In re K.B.*, 7th Dist. No. 09 BE 24, 2010-Ohio-1015.