JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant, Clifton Oliver, appeals from his conviction and sentence for three counts of retaliation in violation of R.C. 2921.05. For the reasons that follow, we vacate his conviction and sentence.
 {¶ 2} According to the record, defendant is a Marine and veteran of the Gulf War. In 2002, defendant was indicted by a Cuyahoga County Grand Jury on multiple counts related to an incident that transpired at Jacobs Field. The State dismissed the charges against him in that case without prejudice when the prosecutor deemed the evidence insufficient to proceed to trial against him. Defendant subsequently filed a civil lawsuit against multiple parties maintaining that he was the subject of a malicious prosecution in the 2002 criminal case. Defendant prevailed in his civil action obtaining a sizable verdict, which was affirmed in part and vacated in part by this Court in Krieger v. Cleveland IndiansBaseball Co., et al, Cuyahoga App. Nos. 89314, 89428 and 89463,2008-Ohio-2183. The facts relative to defendant's ordeal are detailed inKrieger, and include reference to evidence that an officer said he knew defendant was not involved at the time of his arrest; that a videotape revealed defendant was not present in the immediate area where the offense was committed; that defendant was branded a "terrorist" by police officers and the media; and his previously "flawless military career" was ruined by the accusations that were made against him.
 {¶ 3} For reasons stated in the record, defendant developed serious mental health conditions that led him to seek treatment at the VA hospital. Defendant was advised that his discussions with these medical professionals were confidential. *Page 4 
There is no indication in the record that defendant had any expectation or intention that these communications be divulged to non-treating personnel.
 {¶ 4} Sometime in September 2007, defendant sought treatment at the VA hospital. It is undisputed that defendant met with a registered nurse in her professional capacity when he divulged certain compulsions and desires of harming others and himself. On this occasion, he was agitated and reported a desire to beat up the prosecutor, judge, and police officer that were involved in his 2002 criminal case, which he felt had ruined his life. He also indicated an intention to purchase a gun and shoot himself. Following procedure, the registered nurse, who was conducting this particular therapy session, involuntarily committed defendant for further treatment and reported what she perceived to be threats posed by defendant to himself and certain others. Again, following their duties and training, VA hospital personnel warned the identified individuals that there was a concern for their safety.
 {¶ 5} Besides the registered nurse, the remaining witnesses who testified about defendant's statements provided mostly hearsay statements derived from what they were told by persons besides defendant.
 {¶ 6} Defendant's treating physician also testified at trial. The doctor testified from his notes taken from information provided to him from the out-patient provider who evaluated defendant. This witness's testimony concerning defendant's alleged statements was comprised largely of hearsay. According to him, the treatment team collectively decided to execute the duty to warn. The consensus to warn was based upon defendant's reported statements coupled with his mental illness diagnosis. *Page 5 
 {¶ 7} Defendant's treating physician stated that defendant communicated to him that he had thoughts of harming the specific individuals. He, however, did not specify exactly what defendant said to him. According to the treating physician, defendant also denied, on three separate occasions, any true desire or plan to harm anyone, stating he just wanted to scare them. Defendant also stated that the hospitalization was a mistake, explaining that he "was just trying to vent with [his] therapist, and said [he] never said he would hurt anyone." Defendant told his treatment team that he felt the individuals were criminal but felt there was nothing he could do, that "[t]hey will be punished by God." The treatment team proceeded to execute the duty to warn in accordance with hospital policy. The individuals were told that defendant had "thoughts to harm" them. The doctor told the former judge that defendant was improving and did not make threats in his presence. Defendant had also encountered the police officer in public without incident.
 {¶ 8} On cross-examination, the doctor confirmed that it is a balancing act between protecting the confidentiality of the patient being treated and the necessity of keeping the public safe. Ultimately, defendant remained hospitalized and even executed a voluntary commitment to the hospital. Defendant's medications were adjusted and he showed improvement. The following testimony was also elicited:
 {¶ 9} "* * * [Defendant] is there seeking help for his mental illness. He is meeting with you and other team members under the theory that if he shares his true feelings with you, then you will be able to help him deal with his frustration and anger towards other people, right? *Page 6 
 {¶ 10} "A. Correct.
 {¶ 11} "Q. And is it fair to assume that you really want him to tell you how he truly feels, not something that is going to keep him out of trouble?
 {¶ 12} "A. Correct.
 {¶ 13} "Q. And so even if he knows that you might have a duty to warn somebody about the threat, the whole purpose of therapy and the reason for that hospital being there is to help sick people like [defendant] overcome their mental problems with respect to anger issues and other factors, right?
 {¶ 14} "A. We are there to help the patient.
 {¶ 15} "Q. And for you to, for him to be dishonest with you about how he truly feels, wouldn't that disrupt and jeopardize completely the whole therapeutic operation of the hospital?
 {¶ 16} "A. Correct. We ask him to be honest in all aspects of treatment, not only with the aspects of the threats." (Tr. 228.)
 {¶ 17} All of the medical professional witnesses testified that patients, such as defendant, are encouraged to be completely forthright about their feelings in order that they obtain maximum benefits in treatment. After a period of treatment, the hospital discharged defendant because they felt he was no longer a risk or an imminent threat to anyone.
 {¶ 18} The VA social worker who had met with defendant on 15-20 occasions also testified. He stated that the duty to warn arose from defendant's statements that he wanted to harm others. The social worker did not indicate that defendant *Page 7 
had made any threats in his presence. The social worker carried out the duty to warn by generally telling the judge, the prosecutor, and the police officer that defendant had "made a threat to harm" them.
 {¶ 19} The resident psychiatrist who attended defendant during his VA hospitalization testified as well. Defendant told her that he had "homicidal tendencies" and was unable to say that he would not harm the people during the time of his involuntary hospitalization.
 {¶ 20} The former prosecutor testified that he had previously sensed a "garden variety animosity" from defendant but admitted that defendant had never made any overt threats to him nor had defendant ever made any acts of aggression towards him.
 {¶ 21} The former judge testified that he was provided a general warning that defendant had made threats and that defendant had "homicidal thoughts." The judge was informed that defendant was being released and no longer posed a threat of danger to him. Although the judge probed for further information, none was provided to him by the VA hospital. This caused him concern as to whether a proper assessment had been made of defendant. The judge stated that he "wasn't worried about a short-term danger. [He] was looking at this in the very long-term basis." The judge sought to have defendant evaluated by an outside expert, which the VA hospital declined. The judge then filed a lawsuit seeking a temporary restraining order to keep defendant hospitalized pending an order requiring the VA hospital to disclose further information to the judge. The matter was subsequently *Page 8 
dismissed because criminal charges had been filed against defendant in this case. The judge confirmed that he did not want charges filed against defendant, he just wanted to ensure that defendant received the appropriate help. Defendant had never contacted the judge outside of the courtroom.
 {¶ 22} The police officer testified he was notified by the VA Police Department that defendant had made threats against his life. The officer was concerned for his safety. The officer confirmed he had encountered defendant at a restaurant but defendant did not speak to him or make any movements towards him.
 {¶ 23} Police executed a search warrant at defendant's apartment but were unable to locate a rifle, handgun, ammunition, or knives. Nor did police find a "hit list" or any written threats to do harm. Although police recovered certain components of weaponry, they were obtained from defendant's estranged wife.
 {¶ 24} The court, over defendant's objection, permitted the State to amend the indictment to include the purposeful element of the retaliation charges. At the close of the State's case-in-chief, defendant moved for acquittal. Defendant argued that the subject statements were made for purposes of therapeutic treatment, made in a confidential setting, and that defendant's actual statements to the registered nurse were not threats of harm but only statements of his feelings and desires — i.e., what he wanted to do; not what he intended to do. The court denied the motion for acquittal.
 {¶ 25} Defendant presented the testimony of Joel Cox, who is a friend of defendant's family, who was having lunch with defendant and defendant's mother *Page 9 
when the police officer entered the restaurant. He stated that defendant did nothing to the officer and that the officer left within two minutes.
 {¶ 26} Defense counsel renewed the motion for acquittal, which was again denied. The jury was instructed and returned guilty verdicts on all counts. Defendant now appeals his conviction and sentence, raising four assignments of error for our review.
 {¶ 27} "I. The trial court erred in overruling appellant's Rule 29 motions for acquittal and further in entering judgment of conviction as the State failed to present evidence sufficient for conviction, failing to prove threat of harm to any person."
 {¶ 28} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
 {¶ 29} Defendant was charged with three counts of retaliation in violation of R.C. 2921.05(A), which provides:
 {¶ 30} "(A) No person, purposely and by force or by unlawful threat of harm to any person or property, shall retaliate against a public servant, a party official, or an attorney or witness who was involved in a civil or criminal action or proceeding *Page 10 
because the public servant, party official, attorney, or witness discharged the duties of the public servant, party official, attorney, or witness."
 {¶ 31} In this case, the only evidence of an alleged unlawful threat of harm were statements defendant made to persons for purposes of seeking mental health treatment. The only statements defendant made before being involuntarily committed to the hospital were made to the registered nurse. Although she testified generally that defendant had made "threats" against others, she testified that the substance of these alleged threats were: "he wanted to beat to a pulp [the judge and the prosecutor]. * * * He mentioned policemen, but not by name at that time."
 {¶ 32} The evidence establishes that defendant made these statements to his therapist and treating physicians for purposes of treatment. The substance of the "threats" were statements of defendant's feelings and desires. By all accounts, defendant was encouraged to be truthful about his thoughts in order that he receive appropriate treatment. He was told his communications with these persons were confidential. See State v.Farthing (2001), 146 Ohio App.3d 720, 724 (where a defendant does not reasonably expect his statements to be communicated to persons, the defendant cannot be convicted of retaliation based on those statements). There is no indication that defendant expected or intended his feelings or thoughts be communicated to non-medical personnel, especially the individuals who he was reporting having thoughts of harming. Due to his forthrightness to his therapist, defendant was involuntarily committed to the hospital for further treatment, and the targets of defendant's frustration and anger were notified for their safety and *Page 11 
in accordance with a perceived duty to warn. Defendant later voluntarily submitted to further treatment, his medications were altered, and he was discharged after the doctors determined he no longer posed a danger to himself or the community.
 {¶ 33} The doctors testified that they must balance a patient's confidentiality with a duty to protect the public from harm potentially posed by patients. In this case, the VA hospital appropriately notified the individuals for whom safety concerns were present. The validity of executing a duty to warn does not necessarily equate to establishing a threat of harm for purposes of proving felony retaliation. Whether a statement constitutes a threat for purposes of retaliation depends on the factual circumstances.
 {¶ 34} A certain amount of confusion in this case arises from the admission of hearsay testimony where several witnesses testified about what they were told defendant had said and also testimony as to what various individuals considered threats. In this case, several witnesses stated that defendant had made threats of harming three individuals. However, the non-hearsay evidence that was elicited from these witnesses at trial established only that defendant had said he wanted to beat them up.
 {¶ 35} We find there was insufficient evidence in the record to find that defendant purposefully or unlawfully threatened any of the subject individuals in retaliation for their involvement with his 2002 criminal matter. See State v. Farthing (2001), 146 Ohio App.3d 720, 725
(statements made to mental health counselor, which warranted safety concerns for the targeted victim, did not stem from a "threat *Page 12 
of harm" expressed by the defendant for purposes of retaliation). To provide otherwise, would increase the risk a mental health patient poses to the public by discouraging them from seeking treatment for fear of being prosecuted for their unhealthy thoughts and feelings. There was no non-hearsay evidence presented at trial that defendant stated any intention or plan to harm these people.
 {¶ 36} We emphasize that no one violated defendant's confidentiality by executing the duty to warn because defendant's statements created legitimate concern for the safety of the three individuals who were warned. R.C. 2317.02(L)(3)(b) exempts from "privileged communications" any "communication made by a client to an employee assistance professional that reveals the contemplation or commission of a crime or serious, harmful act." Health care professionals must be able to use a certain amount of discretion in determining whether to execute a duty to warn without having to make distinctions between a persons feelings and intentions — indeed, the exemption provides for the "contemplation" of committing serious harm. Conversely, for purposes of establishing a felony conviction for retaliation, which does not include "contemplation" of committing harm as an element of the offense, there should be a distinction between what a person says they want or feel like doing rather than what they say they intend to or will do.
 {¶ 37} Accordingly, Assignment of Error I is sustained. *Page 13 
 {¶ 38} "II. The trial court erred in overruling appellant's motion in limine and in admitting into evidence confidential communications between appellant and treating medical personnel.
 {¶ 39} "III. The trial court erred in overruling appellant's motion in limine and in admitting into evidence substantial hearsay evidence.
 {¶ 40} "IV. The trial court erred in permitting amendment of the indictment at the end of the State's case."
 {¶ 41} Given our disposition of Assignment of Error I, we do not find it necessary to address Assignments of Error II, III, and IV, which are moot. App. R. 12(A)(1)(c).
 {¶ 42} Defendant's conviction and sentence are vacated.
It is ordered that appellant recover from appellee his costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 SEAN C. GALLAGHER, P.J., and MARY J. BOYLE, J., CONCUR *Page 1