[Cite as *State ex rel. Jones v. Hoying*, 2025-Ohio-468.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State ex rel. Robert Jones,      :

     Relator,      :

v.       No. 24AP-433

     :

Lisa Hoying, In her official capacity as       (REGULAR CALENDAR)
Chair of the Ohio Parole Board et al.,      :

     Respondents.      :

D E C I S I O N

Rendered on February 13, 2025

**On brief:** *Elizabeth R. Miller*, Ohio Public Defender, and *Victoria A. Bader*, for relator.

**On brief:** *Dave Yost*, Attorney General, and *Andrew Gatti*, for respondents.

IN MANDAMUS

BEATTY BLUNT, J.

{¶ 1} Relator, Robert Jones, has filed this original action in mandamus against respondents Lisa Hoying, chair of the Ohio Parole Board ("parole board"), Scott Widmer, member of the parole board, Jennifer Pribe, chief hearing officer for the parole board, and Jamie Gentene, hearing officer for the parole board. Relator seeks a writ of mandamus ordering respondents to vacate the order finding relator violated the terms of his postrelease control and to enter an order finding insufficient evidence was presented to find relator guilty of the charged violation.

{¶ 2} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate. The magistrate considered the action on its merits and issued a decision, including findings of fact and conclusions of law, which is appended hereto. The magistrate found there is insufficient evidence in the record to support the

parole board hearing officer's finding that relator committed three separate counts of violating Rule 1 of the terms of his postrelease control, and that viewing the evidence in a light most favorable to the APA, no rational trier of fact could find the postrelease control violations proven by a preponderance of the evidence. The magistrate further found that because the postrelease control violations were not supported by sufficient evidence, relator has established a clear legal right to the requested relief and that respondent is under a clear legal duty to provide such relief. Accordingly, the magistrate recommended this court grant relator's request for a writ of mandamus.

**{¶ 3}** No objections have been filed to the magistrate's decision. "If no timely objections are filed, the court may adopt a magistrate's decision, unless it determines that there is an error of law or other defect evident on the face of the magistrate's decision." Civ.R. 53(D)(4)(c).

**{¶ 4}** Upon review, we have found no error in the magistrate's findings of fact or conclusions of law or other defect evident on the face of the magistrate's decision. Therefore, we adopt the magistrate's decision as our own, including the findings of fact and the conclusions of law therein, and conclude that relator has shown he is entitled to a writ of mandamus and therefore his request for same is granted.

*Writ of mandamus granted.*

MENTEL and BOGGS, JJ., concur.

————————————

**APPENDIX**

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Robert Jones, | : | |
| Relator, | : | |
| v. | | No. 24AP-433 |
| | : | |
| Lisa Hoying, In her official capacity as Chair of the Ohio Parole Board et al., | : | (REGULAR CALENDAR) |
| Respondents. | : | |

MAGISTRATE'S DECISION

Rendered on October 15, 2024

*Elizabeth R. Miller*, Ohio Public Defender, and *Victoria A. Bader,* for relator.

*Dave Yost,* Attorney General, and *Andrew Gatti,* for respondents.

IN MANDAMUS

{¶ 5}   Relator Robert Jones has filed this original action in mandamus against respondents Lisa Hoying, chair of the Ohio Parole Board ("parole board"), Scott Widmer, member of the parole board, Jennifer Pribe, chief hearing officer for the parole board, and Jamie Gentene, hearing officer for the parole board. Jones seeks a writ of mandamus ordering respondents to vacate the order finding relator violated the terms of his postrelease control and to enter an order finding insufficient evidence was presented to find relator guilty of the charged violation. For the following reasons, the magistrate recommends granting the writ.

## I. Findings of Fact

{¶ 6}   1. At the time of the filing of this action, Jones was an inmate incarcerated at the Lorain Correctional Institution in Grafton, Ohio.

{¶ 7}   2. Respondents are members or hearing officers of the parole board. The parole board is an administrative section of the Ohio Adult Parole Authority ("APA"), which itself is a bureau-level administrative section of the Division of Parole and Community Services, which in turn is a division of the Ohio Department of Rehabilitation and Correction ("ODRC"). *See* R.C. 5149.02.

{¶ 8}   3. Jones was initially released from incarceration to postrelease control on September 6, 2023.

{¶ 9}   4. While on postrelease control, relator was required to follow certain conditions of supervision or terms of postrelease control. An updated version of the terms of postrelease control were listed on a form signed by relator on April 16, 2024.[1] Among the terms of postrelease control, Jones agreed to abide by Rule 1, which provided as follows: "I will obey federal, state, and local laws and ordinances, including those related to illegal drug use and registration with authorities. I will have no contact with the victim of my current offense(s) or any person who has an active protection order against me." (Stip. at 16.)

{¶ 10}  5. On November 28, 2023, a parole board hearing officer held a postrelease control violation hearing and issued a notice of findings of release violation hearing ("notice of findings"). In the notice of findings, the hearing officer found Jones violated the terms of his postrelease control as a result of incidents that occurred on or about October 20, 2023. Among other violations Jones was found to have committed, the hearing officer found Jones violated the terms of his postrelease control by knowingly causing Officer Landon Robinette, Jones's supervising parole officer, to believe Jones would cause physical harm to Officer Robinette. Under the terms of a sanction receipt and prison term order issued by the hearing officer following the postrelease control hearing, Jones was returned to incarceration for a term of 140 days beginning November 29, 2023.

{¶ 11}  6. Upon the completion of the term imposed under the November 28, 2023 order, Jones was released from incarceration on April 16, 2024. When Jones was released,

---

[1] The terms of postrelease control as provided to Jones upon his initial release from incarceration do not appear in the record of this matter.

he was picked up by Officer Robinette. Jones expressed to Officer Robinette that he was experiencing mental health issues and needed treatment. Officer Robinette took Jones to the emergency department of Akron General Hospital ("Akron General"). Jennifer Brown, M.D., evaluated Jones. In the course of this medical evaluation of Jones's mental health symptoms, Jones disclosed to Dr. Brown that he wanted to harm himself and kill his parole officer. On the same day he was released from incarceration and sought mental health treatment, Jones was rearrested for alleged violations of the terms of postrelease control.

{¶ 12} 7. In an ODRC voluntary statement form signed by Dr. Brown of Akron General on April 16, 2024, Dr. Brown offered the following voluntary statement to Officer Robinette:

> On [April 16, 2024], Mr. Jones stated that he wished to kill his parole officer. When asked if he had access to weapons, he stated "I have people on the street." He states that he was always being messed with and cannot take it anymore. Patient with history of violence. Concerned with threats and previous documented behaviors and criminal record that he would act on threats to parole officer or become violent with residents at the halfway house facility.

(Stip. at 22.)

{¶ 13} 8. In a violation report served on April 22, 2024, Jones was charged with four violations of Rule 1 of the terms of postrelease control as follows:

> COUNT 1: TO WIT: On or about [April 16, 2024] [i]n the vicinity of Akron, Ohio you recklessly caused inconvenience, annoyance, or alarm to your supervising officer (Officer Robinette).
>
> * * *
>
> COUNT 2: TO WIT: On or about [April 16, 2024] [i]n the vicinity of Akron, Ohio you recklessly caused inconvenience, annoyance, or alarm to Dr. Jennifer Brown.
>
> * * *
>
> COUNT 3: TO WIT: On or about [April 16, 2024] [i]n the vicinity of Akron, Ohio you threatened to commit an offense of violence or otherwise caused public inconvenience or alarm.
>
> * * *
>
> COUNT 4: TO WIT: On or about [April 16, 2024] [i]n the vicinity of Akron, Ohio you knowingly caused Officer

Robinette to believe that you would cause (serious physical/physical) harm to Officer Robinette.

(Stip. at 6-9.) The factual description provided for each of the charged violations was largely the same, with the addition of certain additional comments or statements specific to certain charged violations. With regard to Count 1 and Count 4, the following statement was offered as corroboration:

Due to the past threats made to his supervising officers' life [sic] when previously arrested and continued desire to kill Officer Robinette upon his release, Officer Robinette believes the offender will continue to pose as a threat to his safety. The offender has expressed capability before to being able to obtain a firearm from the streets and was sanctioned in the past for possession of ammunition. Officer Robinette believes the offender would attempt to kill him and will continue to have the desire to kill him.

(Stip. at 7, 10.) With regard to Count 2, the following statement was offered as corroboration:

Dr. Brown expressed that due to his history of violence she was concerned that he would act on his threats to Officer Robinette or anyone else that would be around him if he was released to a halfway house. Dr. Brown wanted to notify Officer Robinette of what was said due to the severity of the threats and was concerned for Officer Robinette's[] and the public's safety.

(Stip. at 8.) The violation report also copied the text of the voluntary statement of Dr. Brown. (Stip. at 7, 8, and 9.)

{¶ 14} 9. A release violation hearing on the charged postrelease control violations was held on May 21, 2024 before respondent Gentene.[2] At the hearing, Officer Robinette testified that prior to Jones's release, it was communicated that Jones should be picked up from Lorain Correctional Institution upon his release "due to his mental health." (Stip., Ex. M at 7:20-7:30.) Officer Robinette and another parole officer picked up Jones upon his release on April 16, 2024. Officer Robinette described Jones as "agitated" when he was picked up by the parole officers. (Stip., Ex. M at 7:42-7:43.) Jones told Robinette that "he needed to go to an emergency room because he was having a psychiatric crisis" and had "detoxed" off his mental health medications. (Stip., Ex. M at 8:19-8:31.) Officer Robinette

_____

[2] An audio recording of the release violation hearing was presented by the parties in the stipulated submission of evidence as Exhibit M.

asked Jones about the nature of his mental health crisis, but Jones told the parole officers that he did not want to tell them. Jones indicated he would talk to hospital staff once he was there.

{¶ 15} The parole officers took Jones to Akron General and initially remained present at the hospital with him. Officer Robinette testified that the doctors at Akron General attempted to ask Jones about his condition with the parole officers in the room, but Jones refused to speak about his condition while the parole officers were present. A doctor told the parole officers that they were going to take Jones for evaluation and told the parole officers that they were free to leave.

{¶ 16} Some hours later, Officer Robinette received a call from Dr. Brown of Akron General, who explained to Officer Robinette that she had a legal requirement to inform him regarding Jones's statement that he wanted to kill his parole officer. According to Officer Robinette, Dr. Brown told Officer Robinette that Jones said he had the means to get a gun. Officer Robinette explained to Dr. Brown Jones's history including the conduct that resulted in his arrest in October 2023. Officer Robinette testified that while Jones was being transported to Lorain Correctional Institution as a result of that arrest, Jones made threats to Officer Robinette's life.

{¶ 17} After being told by Dr. Brown that Jones indicated he wanted to kill his parole officer, Officer Robinette met with his supervisor. It was determined by Officer Robinette's supervisor that it was unsafe for Jones to go to his placement in the halfway house and unsafe for Officer Robinette to transport Jones to the halfway house because Jones "could possibly act out on his threats." (Stip., Ex. M at 12:08-12:11.)

{¶ 18} Officer Robinette said that he felt "concerned" upon learning from Dr. Brown that Jones wanted to kill him because Jones had previously made threats. (Stip., Ex. M at 12:50-12:53.) Officer Robinette testified that he did believe that Jones would cause him physical harm if given the chance to do so.

{¶ 19} On cross-examination, Officer Robinette testified that he was "Crisis Intervention Team certified" in response to being asked about any mental health training he had received. (Stip., Ex. M at 14:40-14:50.) Officer Robinette explained that this meant he was trained in responding to and attempting to deescalate a mental health crisis. When asked what someone experiencing a psychiatric crisis should do, Officer Robinette

explained that "seek professional help by someone who is * * * further trained in mental health." (Stip., Ex. M at 15:57-16:05.) Officer Robinette testified that Jones did not say anything specifically to Officer Robinette that was threatening on April 16, 2024. Officer Robinette stated that he was inconvenienced by Jones because "I just picked him up and he had to be arrested and brought back." (Stip., Ex. M at 20:54-20:58.)

{¶ 20} 10. Following Officer Robinette's testimony at the release violation hearing, the APA attorney called Dr. Jennifer Brown as a witness. Dr. Brown testified that she first encountered Jones when he was brought to the emergency department of Akron General for psychiatric evaluation due to a mental health crisis. When Dr. Brown met with Jones, he displayed a "very calm" demeanor and was "cooperative" in answering Dr. Brown's questions. (Stip., Ex. M at 24:19-24:27.)

{¶ 21} Jones informed Dr. Brown that he was having a "mental health crisis." (Stip., Ex. M at 24:00-24:04.) Jones also told Dr. Brown he "wanted to harm himself" and "wanted to kill his parole officer." (Stip., Ex. M at 24:05-24:12, 24:35-24:40.) Jones did not provide a specific way he intended to kill his parole officer, but rather expressed that he was "tired of being harassed" by his parole officer. (Stip., Ex. M at 24:47-24:49.) When Dr. Brown asked him what means Jones might have, such as access to a gun or something that could physically harm his parole officer, Jones responded: "I have people on the street; I know people." (Stip., Ex. M at 25:00-25:03.) Upon being asked by Dr. Brown why he had not attacked his parole officer on the way to the hospital, Jones responded that there was plexiglass separating them.

{¶ 22} When Jones stated that he wanted to kill his parole officer, Dr. Brown felt "a bit concerned." (Stip., Ex. M at 28:24-28:27.) Dr. Brown's concern related to the statements Jones made regarding hurting himself and his parole officer. Dr. Brown indicated Jones made no threats against her. Jones did not cause Dr. Brown to feel concerned for her own safety.

{¶ 23} After speaking with Jones, Dr. Brown contacted Officer Robinette because she wanted to get further history regarding Jones and because of her belief that she was required by law to alert Officer Robinette to Jones's statements. Dr. Brown tried to find information on Jones's "tendencies" because she was "concerned that [Jones] may act on that" or "may again become violent at the place of residence they were taking him." (Stip.,

Ex. M at 28:57-29:08.) Dr. Brown did not hear Jones make any threats directly to Officer Robinette. Dr. Brown herself relayed the statements made by Jones to Officer Robinette.

{¶ 24} Because Jones was stating homicidal and suicidal ideation, Dr. Brown reviewed Jones's mental health history and spoke with the psychological team at the hospital. Dr. Brown stated that "if you are feeling suicidal or homicidal, you should * * * always get evaluated at the emergency department." (Stip., Ex. M at 37:30-37:36.) Dr. Brown did not treat Jones or make any recommendations for treatment for Jones. Dr. Brown was working on a treatment plan and was trying to find a place for Jones to receive psychiatric treatment because she was concerned about letting Jones go to his placement at the halfway house. When Dr. Brown was informed that Jones was going to be arrested, she determined that she did not have to find inpatient treatment for Jones, arrange any outpatient placement, or conduct further evaluation for Jones at that time.

{¶ 25} 11. After the submission of evidence and testimony had concluded, both the APA attorney and Jones's attorney presented closing arguments. The APA attorney argued that Officer Robinette believed Jones would cause him physical harm based on the comments relayed by Dr. Brown when considered in light of Jones's past threats that formed the subject of the prior release control violations as detailed in the November 28, 2023 notice of findings. The APA attorney further argued that "Jones's behavior that day certainly inconvenienced, annoyed, or alarmed Officer Robinette—he had to take him to the hospital to get him evaluated [and] figure out what's going on since Mr. Jones would not really explain what was going on." (Stip., Ex. M at 44:30-44:50.)

{¶ 26} Jones's attorney presented arguments that there was not sufficient evidence to demonstrate that Jones committed the postrelease control violations because Jones's conduct demonstrated that he did not know the statements made to Dr. Brown in the course of seeking treatment would be relayed to Officer Robinette.

{¶ 27} 12. At the conclusion of the hearing, the parole board hearing officer found Jones guilty of all charged violations.

{¶ 28} 13. On May 21, 2024, the same date as the hearing, the parole board hearing officer mailed a notice of findings. In the notice of findings, the hearing officer summarized the evidence used in arriving at findings and made the following findings:

> After examining and weighing all the evidence presented, such as Dr. Jennifer Brown[']s voluntary statement, [p]rior

> sanction receipt and [notice of findings] as well as the testimony of [parole officer] Robinette and Dr. Brown, there is substantial evidence to demonstrate that [Jones] violated the condition(s) of Rule 1 (cts1-4) beyond a preponderance of the evidence standard.

(Stip. at 14.) Also on May 21, 2024, the hearing officer issued a sanction receipt and prison term order sanctioning Jones to a prison term of 171 days effective May 22, 2024.

{¶ 29} 14. In a letter emailed to the parole board on June 12, 2024, reconsideration of the parole board hearing officer's decision was requested.

{¶ 30} 15. Respondent Pribe responded to the request for reconsideration by email on June 28, 2024 as follows:

> The hearing officer's decision is final unless there is case dispositive or prejudicial error. After a full review of the violation hearing record, it was determined that a partial modification of the Notice of Findings and Sanction Receipt was warranted. The Notice of Findings and Sanction Receipt were modified to reflect that the preponderance standard was not met as to violation of rule 1 count 3 (threaten to commit an offense of violence or otherwise cause public inconvenience or alarm). No errors were found regarding the remaining violations during my review. Based on the nature of the remaining violations, the hearing officer's decision regarding the sanction time will remain in effect.

(Stip. at 23.)

{¶ 31} 16. Jones commenced this action by filing his complaint for writ of mandamus on July 12, 2024.

## II. Discussion and Conclusions of Law

{¶ 32} Jones asserts entitlement to the requested writ of mandamus because insufficient evidence was presented to support finding he violated the terms of his postrelease control.

## A. Due Process Requirements in Release Revocation Proceedings

{¶ 33} The Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution provide guarantees of due process of law. *State ex rel. Haylett v. Ohio Bur. of Workers' Comp.*, 87 Ohio St.3d 325, 331 (1999) ("The Fourteenth Amendment to the United States Constitution prohibits any state from depriving 'any person of life, liberty, or property, without due process of law.' "); *Sorrell v. Thevenir*, 69

Ohio St.3d 415, 422 (1994), citing *Direct Plumbing Supply Co. v. Dayton*, 138 Ohio St. 540, 544 (1941) (stating that the Ohio Constitution's " 'due course of law' provision" in Article I, Section 16 "is the equivalent of the 'due process of law' provision in the Fourteenth Amendment to the United States Constitution"). The revocation of release due to a postrelease control violation, like the revocation of parole, implicates a liberty interest and is, therefore, subject to certain procedural protections. *State ex rel. Barber v. Hoying*, 10th Dist. No. 23AP-71, 2023-Ohio-2204, ¶ 11. *See also Morrissey v. Brewer*, 408 U.S. 471, 484 (1972); *State ex rel. Mango v. Ohio Dept. of Rehab. & Corr.*, 169 Ohio St.3d 32, 2022-Ohio-1559, ¶ 18.

{¶ 34} Notably, "an individual subject to a revocation proceeding is not entitled to all the procedural rights accorded to a defendant in a criminal trial." *Barber* at ¶ 12. *See also Morrissey* at 480 (stating that "revocation of parole is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding does not apply to parole revocations"). Rather, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey* at 481. "The minimal requirements of due process in revocation proceedings include, but are not necessarily limited to, the following: (1) written notice of the alleged violations; (2) disclosure to the person subject to revocation of the evidence against them; (3) an opportunity to be heard in person and to present witnesses as well as documentary evidence; (4) the right to confront and cross-examine adverse witnesses, unless the hearing officer finds good cause to prohibit it; (5) a neutral and detached hearing body; and (6) a written statement by the factfinder as to the evidence relied on and the reasons for revocation." *Barber* at ¶ 12, citing *State v. Cardinal*, 10th Dist. No. 09AP-623, 2010-Ohio-3836, ¶ 15. *See also* Ohio Adm.Code 5120:1-1-18(A)(5) (listing other rights for a releasee at a postrelease control release revocation hearing).

{¶ 35} Additionally, a postrelease control violation finding that results in the revocation of release must be based on sufficient evidence in order to satisfy the requirements of due process. *See Barber* at ¶ 27; *State ex rel. Braddy v. Hoying*, 10th Dist. No. 23AP-197, 2023-Ohio-2597, ¶ 20. *See also Mango* at ¶ 18. A decision finding that a releasee has violated the terms of postrelease control is supported by sufficient evidence where there exists "substantial evidence" to support the decision. *Mango* at ¶ 18.

Substantial evidence exists where "the evidence presented by the APA, if believed, is sufficient to satisfy the burden of proof." *Id*. At release revocation proceedings for a postrelease control violation, a violation must be established by the preponderance of the evidence. *Braddy* at ¶ 21; Ohio Adm.Code 5120:1-1-18(A)(3). Thus, there exists sufficient evidence to support a finding of a postrelease control violation where the evidence presented by the APA, if believed, demonstrates the violation by a preponderance of the evidence. *Id*.

## B. Mandamus

{¶ 36} A writ of mandamus is an extraordinary remedy " 'issued in the name of the state to an inferior tribunal, a corporation, board, or person, commanding the performance of an act which the law specifically enjoins as a duty.' " *State ex rel. Russell v. Klatt*, 159 Ohio St.3d 357, 2020-Ohio-875, ¶ 7, quoting R.C. 2731.01. *See State ex rel. Blachere v. Tyack*, 10th Dist. No. 22AP-478, 2023-Ohio-781, ¶ 13 (stating that the purpose of mandamus is to compel the performance of an act that the law specifically enjoins as a duty resulting from an office, trust, or station). In order for a writ of mandamus to issue in this matter, Jones must establish by clear and convincing evidence (1) a clear legal right to the requested relief, (2) a clear legal duty on the part of respondents to provide it, and (3) the lack of an adequate remedy in the ordinary course of the law. *State ex rel. Gil-Llamas v. Hardin*, 164 Ohio St.3d 364, 2021-Ohio-1508, ¶ 19. " 'Clear and convincing evidence' is a measure or degree of proof that is more than a preponderance of the evidence but less than the beyond-a-reasonable-doubt standard required in a criminal case; clear and convincing evidence produces in the trier of fact's mind a firm belief of the fact sought to be established." *State ex rel. Ware v. Crawford*, 167 Ohio St.3d 453, 2022-Ohio-295, ¶ 14, citing *State ex rel. Miller v. Ohio State Hwy. Patrol*, 136 Ohio St.3d 350, 2013-Ohio-3720, ¶ 14. A writ of mandamus may issue where an individual establishes that a postrelease control violation resulting in the revocation of release was based on insufficient evidence in violation of due process. *Braddy* at ¶ 20, citing *Barber* at ¶ 11.

## C. Analysis

{¶ 37} Jones was charged with and found to have committed four counts of violating Rule 1 of the terms of his postrelease control. Upon Jones's request for reconsideration, respondent Pribe vacated the finding that Jones committed Count 3 of the charged

violations, but maintained the findings for the remaining counts and the sanction imposed for the violations. In this mandamus action, Jones argues insufficient evidence was presented to support finding he committed the remaining violations of the terms of his postrelease control.

*1. Whether Sufficient Evidence Supported Count 4*

{¶ 38} First, with regard to Count 4 of the charged postrelease control violations, there was insufficient evidence presented to establish Jones had the requisite mens rea,[3] or culpable mental state, to commit the charged violation. "[E]very criminal offense" contained in the Ohio Revised Code "is made up of (1) a voluntary act or failure to act when there is a duty; and (2) a culpable mental state for each element that specifies a mental state." *State v. Johnson*, 128 Ohio St.3d 107, 2010-Ohio-6301, ¶ 16, citing R.C. 2901.21(A). Under Count 4, Jones was charged with violating Rule 1 of the terms of his postrelease control, which required Jones to obey federal, state, and local laws, for knowingly causing Officer Robinette to believe Jones would cause Officer Robinette physical harm. Though the violation report in this case does not specify the statutory section upon which the Rule 1 violation was predicated, an issue that merits further discussion below, this description matches the offense of menacing. R.C. 2903.22, which sets forth the offense of menacing, provides in pertinent part that "[n]o person shall knowingly cause another to believe that the offender will cause physical harm to the person or property of the other person." R.C. 2903.22(A)(1). Thus, the culpable mental state for this offense is knowingly.

{¶ 39} The General Assembly has defined the culpable mental states constituting elements of the various criminal offenses contained in the Revised Code. With regard to the mental state of knowingly, R.C. 2901.22(B) provides:

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person

---

[3] *See, e.g., Xiulu Ruan v. United States*, 597 U.S. 450, 469 (2022) (Alito, J., concurring in judgment) (explaining that "[a] culpable mental state—or, to use the traditional Latin term, '*mens rea*'—is the mental state an accused must have in relation to the *elements* of an offense (Emphasis in original.)); *Black's Law Dictionary* 1135 (10th Ed.2014).

> subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

*See generally State v. Preece*, 10th Dist. No. 22AP-252, 2024-Ohio-1556, ¶ 10 (contrasting the term "purposely" with "knowingly").

**{¶ 40}** There is no dispute that Jones did not directly threaten Officer Robinette on April 16, 2024. Rather, the APA argued that Jones's statements to Dr. Brown, which were conveyed by Dr. Brown to Officer Robinette, caused Officer Robinette to believe Jones would cause him physical harm when considered in light of Jones's previous threats, which formed the basis for Jones's prior postrelease control violation as detailed in the November 28, 2023 notice of findings. Jones argues there was insufficient evidence presented to establish that Jones acted *knowingly* in causing Officer Robinette to believe Jones would cause physical harm to him.

**{¶ 41}** In resolving the question presented, the magistrate finds a review of cases confronting similar issues in the context of criminal proceedings to be beneficial. In *State v. Oliver*, 8th Dist. No. 90880, 2009-Ohio-228, a defendant was charged with and convicted of retaliation based on purported threats the defendant made regarding individuals involved in a prior criminal matter. The court found that "the only evidence of an alleged unlawful threat of harm were statements defendant made to persons for purposes of seeking mental health treatment." The registered nurse to whom the defendant made the statements prior to being involuntarily committed "testified generally that defendant had made 'threats' against others," including "want[ing] to beat to a pulp" the judge and prosecutor, in addition to policemen, though not by name at that time. *Id*. at ¶ 31. The court found that these statements were made "for the purposes of treatment" and that the "substance of the 'threats' were statements of defendant's feelings and desires." *Id*. at ¶ 32. The court noted that "[b]y all accounts, defendant was encouraged to be truthful about his thoughts in order that he receive appropriate treatment" and "told his communications with these persons were confidential." *Id*. The court found that "[t]here is no indication that defendant expected or intended his feelings or thoughts be communicated to non-medical personnel, especially the individuals who he was reporting having thoughts of harming." *Id*.

{¶ 42} The court in *Oliver* emphasized that there was no violation of the defendant's confidentiality through the statements made in reliance on the statutory duty to warn because the defendant's statements created "legitimate concern" for the safety of the individuals warned by healthcare providers. *Id.* at ¶ 36. Noting statutory provisions related to privileged communications, the court stated that healthcare providers "must be able to use a certain amount of discretion in determining whether to execute a duty to warn without having to make distinctions between a person's feelings and intentions - indeed, the exemption provides for the 'contemplation' of committing serious harm." *Id.*

{¶ 43} Contrasting the duty to warn with proof in criminal proceedings, the court stated that "[t]he validity of executing a duty to warn does not necessarily equate to establishing a threat of harm for purposes of proving felony retaliation," but instead the issue of "[w]hether a statement constitutes a threat for purposes of retaliation depends on the factual circumstances." *Id.* at ¶ 33. Therefore, based on the facts present in that case, the court found there was insufficient evidence to find that the defendant purposely or unlawfully threatened any of the individuals in question in retaliation for their involvement with his prior criminal conviction. The court noted that "[t]o provide otherwise, would increase the risk a mental health patient poses to the public by discouraging them from seeking treatment for fear of being prosecuted for their unhealthy *thoughts* and *feelings*." (Emphasis in original.) *Id.* at ¶ 35.

{¶ 44} In *State v. Farthing*, 146 Ohio App.3d 720 (2d Dist.2001), Justin Farthing, who was incarcerated at the time, sent a letter to a fellow inmate. In the letter, Farthing made graphic sexual comments in reference to his parole officer and told the recipient, "[l]et's rape [the parole officer]." *Farthing* at 723. Around the same time, a mental health counselor who worked with sex offenders at the prison interviewed Farthing, who was soon to be released. In the course of the interview, Farthing "exhibited delusional fantasies" about the parole officer " 'wanting' him" and stated that "he wanted to 'fuck the shit out' of her." *Id.* Farthing also expressed anger at his treatment by the parole officer. Based on experience with sexual offenders and the combination of sexual delusion and anger expressed by Farthing to his parole officer, the mental health counselor concluded Farthing posed a danger to the parole officer and warned her of such danger. Farthing was charged

and found guilty of retaliation based on the statements in the letter and those made to the mental health counselor about the parole officer.

{¶ 45} On appeal, Farthing contended that he did not make a threat against the parole officer because he did not communicate any intention to harm the parole officer directly or to any third party who could have reasonably been expected to relay the intention to her. The court noted that the offense of retaliation "does not require that any threat of harm be communicated directly to the person threatened by the person doing the threatening," but rather, the court had held that "where 'the defendant was either aware that the threats would be communicated to the intended victim by the third person or could reasonably have expected the threats to be so conveyed,' he is guilty of the type of unlawful threat of harm required by the retaliation statute." *Farthing*, quoting *State v. Lambert*, 2d Dist. No. 16667, 1998 Ohio App. LEXIS 2383 (June 5, 1998).

{¶ 46} With regard to the contents of the letter sent by Farthing to another inmate, the court found that Farthing had no reason to expect that the fellow inmate would notify the parole officer about the statements contained in the letter, even though the statement was reported as part of the prison's inspection of inmate letters. The court distinguished the facts in that case with those in others where the threats were communicated to persons in positions of authority or in a trusted relationship with the person who was the object of the threat. The court further found there was no evidence from which the trial court could have concluded that, prior to the interception of this letter, Farthing should have known that the parole officer would be informed of the threat because of the routine inspection of prison mail.

{¶ 47} Regarding Farthing's statements to the mental health counselor, the court noted the mental health counselor's conclusion that Farthing was a threat to the parole officer based on the comments. While the court found the mental health counselor's concern for the parole officer's safety was "warranted," the court stated that it could not "conclude that this concern stemmed from a threat of harm expressed by Farthing." *Id.* at 725. The court found "Farthing did not make an unlawful threat of harm" regarding the parole officer, "even though his statements did indicate very unhealthy thought processes about her." *Id.*

{¶ 48} In *State v. Dalton*, 2d Dist. No. 28262, 2019-Ohio-4364, Mark Dalton was charged and convicted of retaliation for conduct that occurred during prior proceedings in which Dalton was convicted of gross sexual imposition. At the time of the incident that formed the basis of the gross sexual imposition conviction, Dalton told the victim that if she told anyone about his conduct, he would kill her.

{¶ 49} Prior to sentencing in the gross sexual imposition case, Dalton was interviewed by a screening specialist and clinician with a community correctional institution for possibility of placement in that institution as an alternative to traditional incarceration. While the screening specialist was questioning Dalton about his mental health status, Dalton told her he had suicidal ideation because being charged with gross sexual imposition was devastating for him. Dalton then spoke to the screening specialist about the victim, stating: " 'When I get out, I will retaliate; there will be blood; I will kill her; she must know what she has done to me.' " *Dalton* at ¶ 3.

{¶ 50} The screening specialist reported Dalton's comments to a supervisor, a mental health service provider for the jail at which the defendant was housed, and the detective who investigated the gross sexual imposition case. The prosecutor from the gross sexual imposition case communicated with the victim and the victim's grandmother to relay concerns regarding Dalton's threatening comments and to discourage them from appearing for sentencing. Dalton was thereafter charged with and convicted of retaliation in a new case.

{¶ 51} On appeal, Dalton argued his conviction was against the manifest weight of the evidence because the greater weight of the evidence indicated Dalton had no reason to believe his statements regarding the victim would be relayed to her. Dalton argued that information conveyed to a mental health provider under an expectation of confidentiality could not constitute an " 'unlawful threat of harm' " as required to find him guilty of retaliation. *Id.* at ¶ 21. The court found the screening specialist was not bound to hold in confidence any mental health information shared by Dalton, and that her duty to report credible threats of harm "could negate any confidentiality restrictions that did apply." *Id.* at ¶ 26. Additionally, the court noted that a form provided by the screening specialist expressly authorized her to "disclose to the trial court the information she gathered from and about Dalton; indeed, reporting to the court as part of the presentence investigation

was the very purpose" of the interview. *Id.* As a result, the court affirmed the conviction for retaliation finding that Dalton reasonably could have expected that the screening specialist, as an employee of the community correctional institution, would convey Dalton's threat either to the victim or to persons who would share the information with the victim.

{¶ 52} From review of these cases, the magistrate finds the circumstances present in this matter most closely resemble those in *Oliver*. The evidence in this case reflects that Jones reported to Officer Robinette that he was experiencing a mental health crisis and needed treatment at a hospital. Jones had several opportunities, including when asked by Officer Robinette as to the nature of the mental health issues Jones was experiencing, to directly convey to Officer Robinette that he was having suicidal thoughts and homicidal thoughts related to Officer Robinette. Yet, it was only after Officer Robinette departed the hospital that Jones communicated to healthcare providers—in the context of a medical examination for a mental health crisis—that he was experiencing such thoughts.

{¶ 53} There is no evidence demonstrating that Jones made the statements in question for any purpose other than the diagnosis and treatment of his mental health issues. As in *Oliver*, in which the statements at issue were made to persons for purposes of seeking mental health treatment, there was insufficient evidence presented that Jones knew or had been warned that statements he made in that context could be communicated to nonmedical personnel, especially including Officer Robinette. *Compare Oliver* at ¶ 32, *and State v. Merriman*, 8th Dist. No. 109431, 2021-Ohio-1403, ¶ 13-14 (finding that despite threats that became "more specific," the evidence was insufficient to sustain a conviction for retaliation where the defendant confided and made statements to therapists and treating physicians for treatment purposes), *with Dalton* at ¶ 26. There was also no evidence demonstrating Jones was aware of the reporting obligation that, under Dr. Brown's belief, applied such that the ordinary duty of confidentiality inherent in the physician-patient relationship was overridden by the duty to warn. *See generally* R.C. 2317.02(B)(1) (providing for privilege with regard to communications made in the physician-patient relationship); *Biddle v. Warren Gen. Hosp.*, 86 Ohio St.3d 395, 402 (1999) (stating that "in the absence of prior authorization, a physician or hospital is privileged to disclose otherwise confidential medical information in those special situations where disclosure is made in accordance with a statutory mandate or common-law duty, or

where disclosure is necessary to protect or further a countervailing interest which outweighs the patient's interest in confidentiality"); *Camacho v. Rose-Mary, Johanna Grasselli Rehab.*, 8th Dist. No. 112793, 2024-Ohio-2802, ¶ 19-22 (discussing protection of health information under state and federal law, including the Health Insurance Portability and Accountability Act of 1996, which is commonly known and referred to as "HIPAA"). As a result, the magistrate finds there was insufficient evidence presented to establish by a preponderance of the evidence that Jones had the culpable mental state required for the offense forming the basis of the charged postrelease control violation, i.e., that Jones *knowingly* caused Officer Robinette to believe Jones would cause Officer Robinette physical harm.

{¶ 54} Respondents argue that Jones's contentions rely on a misapplication of law by seeking to have this court "apply the evidentiary standards of criminal proceedings to post release control revocation proceedings." (Respondents' Brief at 14-15.) The magistrate is cognizant of the fact that the cases discussed above were criminal prosecutions in which the standard of proof was beyond a reasonable doubt, whereas this matter concerns a postrelease control violation proceeding in which the standard of proof is preponderance of the evidence. Nevertheless, even under a preponderance of the evidence standard of proof, due process demands sufficient evidence support postrelease control violation findings that result in the revocation of release. *Mango* at ¶ 18; *Braddy* at ¶ 21.

{¶ 55} Respondents also argue that the lack of evidence demonstrating Jones was aware of Dr. Brown's perceived duty to report Jones's statements to Officer Robinette does not alter the outcome of the postrelease control violation proceeding because "mistake of law is not a defense in Ohio." (Respondents' Brief at 12.) It is a "well-known maxim that 'ignorance of the law' (or a 'mistake of law') is no excuse." *Rehaif v. United States*, 588 U.S. 225, 234 (2019), citing *Cheek v. United States*, 498 U.S. 192, 199 (1991). *See State v. Thompson*, 10th Dist. No. 16AP-812, 2017-Ohio-8375, ¶ 27 ("Mistake of law is not a defense in Ohio."); 21 Am. Jur.2d, Criminal Law, § 132 (stating that "a good-faith or mistaken belief that one's conduct is legal does not relieve a person of criminal liability for engaging in proscribed conduct"). Yet, the mistake-of-law maxim applies where the defendant's *conduct* is prohibited by law, not where the defendant is mistaken about the legal

implications of a *collateral matter*. The Supreme Court of the United States has addressed this distinction:

> This maxim [that ignorance of the law is no excuse], however, normally applies where a defendant has the requisite mental state in respect to the elements of the crime but claims to be "unaware of the existence of a statute proscribing his conduct." 1 W. LaFave & A. Scott, *Substantive Criminal Law* §5.1(a), 575 (1986). In contrast, the maxim does not normally apply where a defendant "has a mistaken impression concerning the legal effect of some collateral matter and that mistake results in his misunderstanding the full significance of his conduct," thereby negating an element of the offense. *Ibid.*; see also Model Penal Code §2.04, at 27 (a mistake of law is a defense if the mistake negates the "knowledge . . . required to establish a material element of the offense"). Much of the confusion surrounding the ignorance-of-the-law maxim stems from "the failure to distinguish [these] two quite different situations." LaFave, *Substantive Criminal Law* §5.1(d), at 585.

*Rehaif* at 234. *See also* 29A Ohio Jur.3d, Criminal Law, Substantive Principles and Offenses, § 103 ("The maxim normally applies when a criminal defendant has the requisite mental state in respect to the elements of the crime but claims to be unaware of the existence of a statute proscribing the defendant's conduct, and the maxim does not normally apply when a defendant has a mistaken impression concerning the legal effect of some collateral matter and that mistake results in misunderstanding the full significance of the conduct, thereby negating an element of the offense.").

{¶ 56} From *Rehaif*, it is apparent that the mistake-of-law maxim is not relevant to the matter at hand. Jones's disclosure of his homicidal and suicidal ideation to Dr. Brown was not, in and of itself, alleged to be prohibited by law. Rather, the issue in this matter stems from the consequences of Dr. Brown's disclosure, consistent with her understanding of her legal duty to report, of Jones's ideation to Officer Robinette.[4] As argued by the APA,

---

[4] Much has been written about the confidentiality of physician-patient communications and the ethical issues raised by a physician's testimony regarding such communications. *See, e.g., United States v. Hayes*, 227 F.3d 578, 584 (6th Cir.2000) (noting the "paradoxical nature of this case" because "[o]n the one hand, Hayes should be applauded for seeking professional help for the mental and emotional difficulties he was suffering," but "because the psychotic delusions for which he sought treatment took the form of homicidal intentions toward an employee of the federal government, Hayes now finds himself facing a felony conviction and incarceration because his professional care givers are prepared to testify against him"); Parsio, *Note: The Psychotherapist-Patient Privilege: The Perils of Recognizing a "Dangerous Patient" Exception in Criminal Trials*, 41 New Eng. L. Rev. 623, 649 (2007) (arguing that "[n]o 'dangerous patient' exception to the

it was this disclosure, when considered in light of Jones's prior conduct that served to establish prior violations in the November 28, 2023 notice of findings, that caused Officer Robinette to believe Jones would cause him physical harm. Thus, Dr. Brown's perceived duty to report is a collateral matter in this case. Any mistaken impression Jones may have had regarding this collateral matter does not implicate the mistake-of-law maxim. Because of this, respondents' mistake-of-law arguments are misplaced.

{¶ 57} Therefore, the magistrate finds there was insufficient evidence presented to establish by a preponderance of the evidence that Jones committed the violation of his terms of postrelease control as set forth in Count 4.

*2. Whether Sufficient Evidence Supported Count 1*

{¶ 58} Next, under Count 1, Jones was found to have violated Rule 1 of the terms of his postrelease control by having recklessly caused inconvenience, annoyance, or alarm to Officer Robinette. As previously discussed, the counts in the violation report do not specify the names of the offenses or the statutory sections upon which the violations of Rule 1 were predicated. Though in some instances it is relatively easy to deduce the offense in question from the information in the violation report, it is more problematic where, as appears to be the case in Counts 1 and 2, the charged violations do not fully contain the statutory language that sets forth the offense in question. The closest analogue to the language contained in Count 1 and 2 appears to be the offense of disorderly conduct.

{¶ 59} R.C. 2917.11, which codifies the offense of disorderly conduct, provides in pertinent part as follows:

> No person shall recklessly cause inconvenience, annoyance, or alarm to another **by doing any of the following:**
>
> (1) Engaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior;
>
> (2) Making unreasonable noise or an offensively coarse utterance, gesture, or display or communicating unwarranted and grossly abusive language to any person;

---

psychotherapist-patient privilege should exist for criminal trials"); Hall, *Law, Medicine, and Trust*, 55 Stan. L. Rev. 463, 498-500 (2002); Harris, *The Dangerous Patient Exception to the Psychotherapist-Patient Privilege: The* Tarasoff *Duty and the* Jaffee *Footnote*,74 Wash. L. Rev. 33 (1999).

(3) Insulting, taunting, or challenging another, under circumstances in which that conduct is likely to provoke a violent response;

(4) Hindering or preventing the movement of persons on a public street, road, highway, or right-of-way, or to, from, within, or upon public or private property, so as to interfere with the rights of others, and by any act that serves no lawful and reasonable purpose of the offender;

(5) Creating a condition that is physically offensive to persons or that presents a risk of physical harm to persons or property, by any act that serves no lawful and reasonable purpose of the offender.

(Emphasis added.) R.C. 2917.11(A). Thus, disorderly conduct is not established merely upon proof that a person has recklessly caused inconvenience, annoyance, or alarm to another. Rather, that inconvenience, annoyance, or alarm must have resulted from one of the activities listed in the subsections.

{¶ 60} Here, the violation report did not clearly or unambiguously communicate all of the elements of the offense forming the basis for the charged violation of the terms of postrelease control. As previously mentioned, the Supreme Court has made clear that the full panoply of rights to which a defendant is entitled in a criminal proceeding do not apply in a revocation proceeding, such as the revocation of postrelease control proceedings at issue here. *Morrissey*, 408 U.S. at 480. Nevertheless, at a minimum, due process requires certain safeguards, such as written notice of the alleged violations. *Id.* at 489. *See Barber* at ¶ 12. It has been held that "to the extent that the Supreme Court has established written notice of a defendant's violation as a minimum requirement of due process, such notice should be effective." *United States v. Havier*, 155 F.3d 1090, 1093 (9th Cir.1998). Therefore, "when a revocation petition alleges the commission of a new crime and the offense being charged is not evident from the condition of probation being violated, a defendant is entitled to receive notice of the specific statute he is charged with violating." *Id.* Courts confronting this issue have found a complaint charging a violation of disorderly conduct without providing a subsection to be defective in the absence of other facts making clear the elements of the offense at issue. *Compare State v. Echemendia*, 6th Dist. No. OT-95-059, 1996 Ohio App. LEXIS 3523 (Aug. 23, 1996), with *Xenia v. Chard*, 2d Dist. No. 91-CA-17, 1991 Ohio App. LEXIS 5989 (Dec. 12, 1991).

{¶ 61} Regardless of the impact of this lack of clarity about the underlying offense, the evidence presented was insufficient to establish Jones had committed the offense of disorderly conduct under the preponderance of the evidence standard because, among other reasons, there was insufficient evidence to establish Jones acted with the requisite culpable mental state. The term "recklessly," the culpable mental state for the offense of disorderly conduct, is addressed as follows:

> A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

R.C. 2901.22(C).

{¶ 62} At the postrelease control hearing, the APA argued that Jones's behavior "certainly inconvenienced, annoyed, or alarmed Officer Robinette—he had to take him to the hospital to get him evaluated [and] figure out what's going on since Mr. Jones would not really explain what was going on." (Stip., Ex. M at 44:30-44:50.) Officer Robinette testified that he was inconvenienced by Jones because "I just picked him up and he had to be arrested and brought back." (Stip., Ex. M at 20:54-20:58.)

{¶ 63} First, having to take Jones to the hospital because, as Officer Robinette testified, Jones was experiencing a "psychiatric crisis" does not constitute any of the conduct listed in R.C. 2917.11(A)(1 through 5). (Stip., Ex. M at 8:19-8:31.) Though Jones did not fully explain his mental health symptoms to Robinette, the failure to do so does not constitute any of the conduct listed in R.C. 2917.11(A)(1 through 5). Nor does the act of arresting someone and transporting them alone constitute any of the conduct listed in R.C. 2917.11(A)(1 through 5). The magistrate also notes that the parole board vacated the finding that Jones committed Count 3 of the charged postrelease control violations because it was not established by a preponderance of the evidence. Under Count 3, Jones was alleged to have "threatened to commit an offense of violence or otherwise caused public inconvenience or alarm." (Stip. at 8.)

{¶ 64} Moreover, the evidence presented in this case does not reflect that Jones acted recklessly, thereby causing Officer Robinette to be inconvenienced, annoyed, or

alarmed. Jones informed Officer Robinette he needed to be taken to an emergency room because he was experiencing a mental health crisis. Jones waited until the parole officers, including Officer Robinette, had left his presence before disclosing to Dr. Brown, the emergency room physician responsible for diagnosing Jones, his suicidal and homicidal ideation. As a result, under the facts and circumstances of this case, there was insufficient evidence presented to demonstrate Jones, with heedless indifference to the consequences, disregarded a substantial and unjustifiable risk that his conduct was likely to cause inconvenience, annoyance, or alarm to Officer Robinette.

{¶ 65} For the foregoing reasons, the magistrate finds there was insufficient evidence presented to establish by a preponderance of the evidence that Jones committed the violation of his terms of postrelease control as set forth in Count 1.

*3. Whether Sufficient Evidence Supported Count 2*

{¶ 66} Third, with regard to Count 2 of the charged postrelease control violations, there was insufficient evidence presented to demonstrate that Jones recklessly inconvenienced, annoyed, or alarmed Dr. Brown. In the course of her duties as a physician at the Akron General emergency department, Dr. Brown interacted with Jones, a patient in the emergency department, for purposes of evaluating his presentation for a mental health crisis and determining an appropriate treatment plan. Dr. Brown stated that Jones had a "very calm" demeanor and was "cooperative" in answering evaluation questions. (Stip., Ex. M at 24:19-24:27.) Dr. Brown testified that she did not feel concerned for her own safety or personally threatened by Jones. Though Dr. Brown expressed concern regarding Jones's statements reflecting suicidal and homicidal ideation, Dr. Brown never testified she was inconvenienced, annoyed, or alarmed by such statements. Rather, Dr. Brown testified that patients frequently disclosed homicidal ideation directed toward individuals outside of those providing healthcare services. In sum, there was no evidence demonstrating Dr. Brown was inconvenienced, annoyed, or alarmed.

{¶ 67} Additionally, there was insufficient evidence presented to establish Jones acted recklessly by disclosing his homicidal and suicidal ideation to Dr. Brown in response to Dr. Brown's questions for purposes of evaluating Jones's presentation for a mental health crisis in a hospital emergency department. Thus, the magistrate finds there was insufficient

evidence presented to establish by a preponderance of the evidence that Jones committed the violation of his terms of postrelease control as set forth in Count 2.

## D. Conclusion

{¶ 68} Upon his release from incarceration, Jones experienced a mental health crisis of sufficient severity for a physician in a hospital emergency department to seek to place him in inpatient or outpatient treatment. Jones was charged with postrelease control violations based on purported violations of the law after he sought mental health treatment from a physician at a hospital, expressed suicidal and homicidal ideations in statements to the physician, and such statements were communicated by the physician to the target of the homicidal ideation, Jones's parole officer. Jones's parole officer and the emergency department physician stated that a person experiencing a mental health crisis, as Jones was in this case, should seek professional help from a mental health services provider or by being evaluated at an emergency department. Under the findings of the parole board, it is unclear how Jones would have been able to fully disclose his symptoms in order to secure mental health treatment without violating the terms of his postrelease control. *See Oliver* at ¶ 35.

{¶ 69} There was insufficient evidence presented to demonstrate Jones knew or should have known that statements he made to the physician in the emergency department could be communicated to his parole officer. Nor was there sufficient evidence presented to establish the other two postrelease control violations. As discussed above, viewing the evidence in a light most favorable to the APA, no rational trier of fact could find the postrelease control violations proven by a preponderance of the evidence.

{¶ 70} For the foregoing reasons, Jones has established a clear legal right to the requested relief, that respondents were under a clear legal duty to provide such relief, and the absence of an adequate remedy at law. Accordingly, it is the decision and recommendation of the magistrate that this court should grant a writ of mandamus ordering respondents to vacate the order finding Jones violated the terms of his postrelease control and to enter an order finding insufficient evidence was presented to find Jones guilty of the charged violations.

/S/ MAGISTRATE
JOSEPH E. WENGER IV

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b). A party may file written objections to the magistrate's decision within fourteen days of the filing of the decision.